Filed 12/18/13  Certified for publication 1/7/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of MARK and RHONDA FINBY.<br><br>MARK FINBY,<br><br>        Appellant,<br><br>                        v.<br><br>RHONDA FINBY,<br><br>        Respondent. | G046814<br><br>(Super. Ct. No. 10D004955)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, Ronald P. Kreber, Judge.  Reversed.

        Law Offices of Brian G. Saylin and Brian G. Saylin for Appellant.

        Phillips, Whisnant, Gazin, Gorczyca & Curtin, Gary S. Gorczyca and Daniel Gorczyca for Respondent.

Mark Finby (husband) appeals from a judgment on reserved issues, covering child custody and support, spousal support, and division of the parties' assets. He contends the trial court erred in its characterization, valuation, and division of Rhonda Finby's (wife) bonuses conditionally received or earned from her employer before the parties separated. We find his arguments have merit and reverse the judgment.

FACTS

The parties married in 1995 and separated in February 2010. During the marriage, wife worked as a financial advisor. Before January 2009, she worked for UBS Financial Services. She developed a list of clients referred to as her "book of business." As of January 2009, the value of her clients' investments exceeded $192 million.

That month wife signed a contract with Wachovia Securities LLC, entitled "Offer Summary," agreeing to work for it as a financial advisor and its managing director of investments. (Some capitalization omitted.) Shortly thereafter, Wachovia was purchased by Wells Fargo Advisors (Wells Fargo).

The offer summary contained several compensation bonuses. The first, a transitional bonus exceeding $2.8 million, was "based on 150% of [wife's] pre-hire trailing twelve months production . . . of $1,868,631.00 . . . and pre-hire assets of $192,671,911." Her entitlement to receive the entire amount was conditioned on her remaining employed as a financial advisor by Wells Fargo for 112 months, maintaining a gross production level of over $1.12 million on each anniversary date, and remaining current on any other obligations she owes to the firm.

Wife chose to immediately receive the entire amount of the transitional bonus. Thus, payment was arranged as a loan evidenced by a promissory note whereby Wells Fargo agreed to forgive the sum of $27,687.54 each month over 112 months. For tax purposes, Wells Fargo credited wife with an equal amount of income on each

2

monthly pay voucher.  However, to enforce the foregoing conditions, it was provided that if she stopped working for Wells Fargo, the entire unpaid balance of the loan would be due.  In the event wife continued working for the firm but failed to satisfy the minimum production quota during annual reviews, Wells Fargo could "reduce the amount of [the] [m]onthly . . . [b]onus [p]ayment" credited to her.

The offer summary also provided wife could receive a deferred recruitment award bonus of $186,863.  But to be eligible for it she must remain employed by Wells Fargo until January 31, 2016.

In addition, the offer summary stated wife was eligible for two production bonuses.  Wells Fargo agreed to pay her a first production bonus of $373,726 if her "total gross production equal[ed] or exceed[ed] $1,494,905.00 in the best twelve months of the first fourteen month period beginning February 2009 and ending March 2010 . . . ."  Wife achieved this goal and received the entire amount of the bonus in April 2010.  Like the transitional bonus Wells Fargo arranged the payment as a loan evidenced by a promissory note with the balance to be forgiven in equal monthly installments over a 10-year span, and crediting an equal amount as income on wife's monthly pay vouchers.  In addition, Wells Fargo's forgiveness of this obligation was also subject to the same employment and production level conditions.  The offer summary authorized a second production bonus if wife achieved a higher gross production level between April 2010 and March 2011.  Wife failed to achieve the higher production goal and did not qualify for this bonus.

In mid-2009, Wells Fargo announced another benefit for its financial advisors, entitled a level 4front bonus.  Wife testified that to receive it, she had to meet with clients, prepare and maintain investment profiles of them, plus follow up with each client's investment profile.  She qualified for this bonus and was paid $890,000 in mid-2010.  As with the foregoing bonuses, payment of the level 4front bonus was arranged as a loan evidenced by wife's promissory note with Wells Fargo agreeing to forgive the

3

balance in equal installments over 108 months and, for tax purposes, crediting an equal amount as income to each of her pay vouchers. Wife testified this bonus was also conditioned on her remaining employed with Wells Fargo and maintaining her client's financial profiles.

Both parties presented expert testimony on wife's book of business and the character of the bonuses she received. Andrew Hunt, a certified public accountant, testified for wife. He employed the time rule to determine the character of the bonuses and accompanying loans. He described the transitional bonus as a "mixed-type asset," with "approximately . . . 13 and a half percent of" it "on an after-tax basis was community" and the balance being wife's separate property. Hunt concluded the first production bonus and the level 4front bonus were wife's separate property because, being earned over a period of years, they were received after separation.

Wife also called Quinton Ellis, an associate with a firm providing litigation assistance to firms in the securities industry. He described the transitional bonus as a "kind of pay for the book of business . . . coming over," calculated as a "multiple of the value of . . . the [recruitee's] production credits of the trailing 12 months before they were to join your firm." The hiring firm would also expect to receive "a nine- to ten-year commitment to earn that bonus" because "you don't want to pay somebody upfront and then have them go into early retirement once they join the firm." Ellis described the production bonus as "a back-end bonus" that is a "performance-based" incentive for the "consultant to work extremely diligently in bringing their book over, as well as to continue to seek new business and continue to be successful . . . ." The level 4front bonus required wife to perform extensive analytical work and complete financial plans for her clients. David Altshuler, wife's boss, testified the level 4front bonus was a "loyalty award" created "to retain our financial advisors."

4

Barbara DiFranza, an attorney and certified family law specialist testified that in her opinion, the bonuses constituted community assets. She described wife's book of business as "[t]he consideration" for the benefits contained in the offer summary.

Husband also called Howard Buchler, an attorney with previously work experience in the securities industry. Buchler agreed with Ellis that the offer summary's transitional bonus compensated wife for bringing her book of business to Wells Fargo. He stated the brokerage industry now recognizes that brokers own their book of business. Asked if a market existed for "a financial advisor . . . to sell her book of business," Buchler responded, "the market for it would be . . . [moving to] another [firm]."

Stephen Zamucen, a certified public accountant called by husband, testified the bonuses wife received were community assets. He explained the bonuses were either based on her book of business (transitional), agreed to before the parties separated, or based on wife's pre-separation production (first production and level 4front).

The court issued a statement of decision and entered judgment. On wife's book of business, the court ruled it had no value and husband did not have an interest in it. In its statement of decision, the court agreed wife received a high salary from Wells Fargo because of the value of the investments held by her clients, but husband's assistance in helping wife transfer her clients to Wells Fargo "did not give[] him an interest in the [b]ook of [b]usiness," "there was no expert testimony given as to the value of" it, and, citing *In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, found the book of business "cannot be transferred to another party for a price."

As for the bonuses, the court ruled the portion of transitional bonus earned during the first 11 months of wife's employment with Wells Fargo (slightly over $380,000) was received before separation and thus constituted community property to be divided between the parties. But it concluded the balance of that bonus and the remaining bonuses were wife's separate property because they were not paid or due until after the parties separated. In addition, the court noted wife's retention of the bonuses

5

was subject to her continued employment and minimum production requirements enforced by the promissory notes. It found the reasoning in *In re Marriage of Doherty* (2002) 103 Cal.App.4th 895 and *Garfein v. Garfein* (1971) 16 Cal.App.3d 155 supported its findings.

## DISCUSSION

### 1. *Introduction*

The issues presented in this appeal are the trial court's characterization and valuation of wife's list of clients, i.e., her book of business, and the bonuses Wells Fargo conditionally agreed to pay her.

"In general, all property that a spouse acquires during marriage before separation is community property." (*In re Marriage of Green* (2013) 56 Cal.4th 1130, 1134; see also Fam. Code, § 760; all further undesignated statutory references are to this code.) Cases have recognized that Family Code section 760 creates "'a general presumption that property acquired during marriage by either spouse other than by gift or inheritance is community property unless traceable to a separate property source.'" (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 731.) However, "[t]he earnings and accumulations of a spouse . . . while living separate and apart from the other spouse, are the separate property of the spouse." (Fam. Code, § 771, subd. (a).)

Under California's community property law, the characterization of "property as separate, community, or quasi-community" "is an integral part of the division of property on marital dissolution." (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 291.) Courts recognize several factors relevant to this task (see *In re Marriage of Rossin, supra.* 172 Cal.App.4th at p. 732), but "the most basic characterization factor is the time when property is acquired in relation to the parties' marital status" (*In re Marriage of Haines, supra,* 33 Cal.App.4th at p. 291). The "factual

6

findings that underpin the characterization determination are reviewed for substantial evidence" (*In re Marriage of Rossin, supra,* 172 Cal.App.4th at p. 734), but "[i]nasmuch as the basic 'inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values,' the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law. [Citation.] As such, it is examined de novo" (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 184).

Once the court determines the assets and liabilities of the community estate, it must value them and make an equal division of the estate. (§§ 2550-2552, 2601, 2620 et seq.; see *In re Marriage of Walrath* (1998) 17 Cal.4th 907, 924.) Issues concerning the valuation and apportionment of community property are reviewed for abuse of discretion. (*In re Marriage of Lehman, supra,* 18 Cal.4th at p. 187 [apportionment]; *In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 197 [valuation].)

*2. The Book of Business*

As noted, the trial court awarded wife's book of business to her. Citing *In re Marriage of McTiernan & Dubrow, supra,* 133 Cal.App.4th 1090, it concluded since wife could not sell her client list, her book of business "has no value[,] and . . . [husband] does not have an interest in" it. On appeal, husband attacks this ruling. He argues the book of business can be valued even if there is no market for it, and in fact she sold her book of business when moving from UBS to Wells Fargo. Husband also relies on the Supreme Court's decision in *In re Marriage of Brown* (1976) 15 Cal.3d 838 (*Brown*) and other cases following it for the proposition that rights created under an employment contract entered into during marriage, even if contingent in nature, constitute divisible community assets. Wife disagrees, arguing the trial court properly found her book of business was nontransferable, "Wells Fargo agreed to pay [her] a significant sum of

7

money because she is successful at her job," and that her "success is primarily measured by the amount of assets she manages."

We conclude the trial court's ruling on the nature and value of wife's book of business constituted error. "[T]o qualify as community property, an asset or interest must be 'property' within the meaning of the community property laws." (*In re Marriage of Spengler* (1992) 5 Cal.App.4th 288, 297.) Husband argues wife's status as a licensed financial advisor with the ability to induce clients to follow her when transferring to a new firm is similar to the goodwill found in the business of other professions such as lawyers and doctors.

This argument has merit. Business and Professions Code section 14100 declares "[t]he 'good will' of a business is the expectation of continued public patronage." "[I]t is well established that the goodwill of a . . . professional practice as a sole practitioner created during marriage constitutes a divisible asset of the community in an action for dissolution of marriage. (*In re Marriage of Foster* (1974) 42 Cal.App.3d 577, 582; see also *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 372.) "'[W]here the issue is raised in a marital dissolution action, the trial court must make a specific finding as to the existence and value of the "goodwill" of a professional business as a going concern'" even if it involves the business "'of a sole practitioner . . . .'" (*In re Marriage of Fenton* (1982) 134 Cal.App.3d 451, 460.) As for the nature of a client list, in *Dairy Dale Co. v. Azevedo* (1931) 211 Cal. 344, the Supreme Court recognized "[i]t is settled in this state that the names, addresses and requirements of an employer's customers . . . constitute part of the goodwill of the business . . . ." (*Id.* at p. 345.)

The parties have not cited, nor have we found, a California case on point concerning whether a licensed professional's list of clients is an asset subject to division in a dissolution action. But courts in other jurisdictions have generally held customer lists of licensed professionals who are employed in a business or industry constitute divisible marital property. (*Moll v. Moll* (N.Y.Supr.Ct. 2001) 187 Misc.2d 770, 775 [722

8

N.Y.S.2d 732] [clients serviced by stockbroker constitute marital asset; "the 'thing of value' is the personal or professional goodwill of a stockbroker or financial advisor"]; *Reiss v. Reiss* (Fla.Dist.Ct.App. 1995) 654 So.2d 268, 268-269 [stockbroker's "signing bonus" for clients he brought with him to new securities firm is a divisible marital asset]; *Niroo v. Niroo* (Md.Ct.App. 1988) 313 Md. 226, 234-235 [545 A.2d 35] [insurance agent's anticipated renewal commissions on policies sold during marriage "are type of property interest encompassed within the definition of marital property"]; *Pangburn v. Pangburn* (Ariz.Ct.App. 1986) 152 Ariz. 227, 230 [731 P.2d 122] [citing *Brown*, insurance agent's "contractual right to commissions for future renewals . . . earned during coverture" includable within community estate].)

The record before us is unclear, but in this appeal husband claims, and wife apparently does not dispute, that she acquired her book of business during their marriage. Contrary to the trial court's findings, the terms of the offer summary and the testimony of the parties' experts reflect wife's book of business, i.e. list of clients, was a valuable asset. The offer summary states the transitional bonus was "based on 150% of your pre-hire trailing twelve months production, subject to and following verification of pre-hiring twelve months production of $1,868,631.00 . . . and pre-hire assets of $192,671,911," and that "[e]vidence of both assets under management and trailing twelve [month] production shall be dated within sixty days prior to your date of hire."

Both Ellis, wife's securities industry expert, and Buchler, husband's securities expert, acknowledged financial advisors are viewed as professionals. In order to work in the securities industry financial advisors must acquire and maintain one or more licenses. Wife's professional credentials include being certified as a financial planner, an investment management analyst, and a retirement planning counselor. Buchler testified the securities industry now recognizes a "financial advisor owns [his or her] book of business." Both experts agreed that industry protocol allows a financial

9

advisor to take the names of his or her clients, plus their account and telephone numbers when changing firms.

Ellis described the transitional bonus "as kind of the up-front bonus," the purpose of which was "to aid the transition and – basically, if you would, kind of pay for the book of business as it was coming over." Buchler agreed wife received the transitional bonus as compensation for bringing her book of business to Wells Fargo. He explained the value of a financial advisor's book of business would "range . . . anywhere from one to three times the gross . . . commissions generated by the book of business." Although claiming wife would have been entitled to "some bonus based on her [previously demonstrated] production credits, her expertise, and her ability to build business," Ellis conceded that without bringing the book of business to Wells Fargo she likely would not have received a transitional bonus of $2.8 million.

Thus, wife's book of business was a valuable asset. The evidence reflects Wells Fargo agreed to pay wife $2.8 million for bringing her customers to the firm. The difficulty presented is that the transitional bonus was to be paid over several years, but wife received the entire amount in advance subject to the conditions that she continue to work as a financial advisor for the firm, maintain a minimum production level, and remain current on her other obligations to the firm. Wells Fargo enforced these terms by requiring wife sign a promissory note for the entire amount to be forgiven in monthly installments over a 9 to 10 year period.

But the fact that wife's right to receive the bonus is subject to contingencies does not preclude it from being a divisible community asset. In *Brown*, the Supreme Court held "[p]ension rights, whether or not vested, represent a property interest . . . subject to division in a dissolution proceeding" where "such rights derive from employment during coverture . . . ." (*Brown, supra,* 15 Cal.3d at p. 842.) In so ruling, *Brown* "reject[ed] th[e] theory" that merely because the right to receive pension benefits was contingent on the employee spouse's continued employment the asset could

10

not be deemed a divisible community asset.  (*Id.* at p. 846.)  "The fact that a contractual right is contingent upon future events does not degrade that right to an expectancy."  (*Id.* at p. 846, fn. 8.)

Shortly after issuing *Brown*, the Supreme Court decided *In re Marriage of Fonstein* (1976) 17 Cal.3d 738.  *Fonstein* rejected a spouse's claim that his contractual right to withdraw from a law firm constituted "a mere expectancy with no present value . . . ."  (*Id.* at p. 745.)  "[W]ithdrawal rights are analogous to the pension rights which have been held to be community property when subject only to conditions within the control of the employee.  [Citations.] . . .  [C]ontractual rights, where the right to payment is earned during marriage, are community property though contingent upon future events."  (*Id.* at pp. 745-746; see also *In re Marriage of Skaden* (1977) 19 Cal.3d 679, 687 [employment contract conditionally granting insurance agent right to receive post-employment payments based on premiums credited to him before termination constitute "'a form of deferred compensation for services rendered[]'" because "these benefits 'derived from the terms of the employment contract'"].)

Here, Wells Fargo paid wife, a licensed financial advisor, $2.8 million as consideration for bringing to the firm clients owning over $192 million in investments that had produced over $1.8 million in commissions and fees in the prior year.  While her right to retain the entire bonus is contingent on satisfying certain obligations, they are "conditions within [wife's] control . . . ."  (*In re Marriage of Fonstein, supra,* 17 Cal.3d at p. 746.)

The trial court's reliance on *In re Marriage of McTiernan & Dubrow, supra,* 133 Cal.App.4th 1090 was error since that case presented a distinguishable situation.  There the husband was a successful movie director.  The trial court held the husband's high status within the film industry constituted goodwill, noting he had "'developed an earning capacity and reputation in his profession . . . which greatly

11

exceeds that of most persons involved in that profession and that [husband] commands a premium for his services.'" (*Id.* at p. 1094.)

After discussing the nature of what constitutes property, including the fact that "property must be capable of being transferred" (*In re Marriage of McTiernan & Dubrow, supra,* 133 Cal.App.4th at p. 1100), the Court of Appeal reversed. "Husband's 'earning capacity and reputation in his profession as a motion picture director . . .' or, in the trial court's shorthand, his 'elite professional standing,' cannot be sold or transferred. His high standing among other motion picture directors is entirely personal to him. He cannot confer on another director his standing . . . . He cannot sell this standing to another . . . . That standing is his, and his alone, and he cannot bestow it on someone else. Thus, an essential aspect of a property interest is absent." (*Id.* at pp. 1100-1101.)

We do not disagree with the ruling in *In re Marriage of McTiernan & Dubrow, supra,* 133 Cal.App.4th 1090. But, as discussed above, the terms of the offer summary and expert testimony reflect Wells Fargo did not pay wife the transitional bonus in return merely for her admittedly high standing in the securities industry. Rather, the consideration for that bonus was her ability to induce clients with significant assets and potential for producing future commissions and fees to follow her when moving to the firm.

The trial court did find the community had an interest in a portion of the transitional bonus. But it was limited to the payments wife earned during the 11 months between the date of her hire and the parties' separation. Based on the foregoing discussion, we conclude this limited valuation constituted an abuse of discretion. Wife's right to receive the bonus, and the obligation to repay it if she failed to satisfy the attached conditions, arose when she signed the offer summary, received immediate payment of the bonus, and began working for Wells Fargo. Further, the ability to satisfy the requirements entitling her to retain the entire bonus is within her control.

12

This does not mean the court must simply award one-half of the $2.8 million to husband. As discussed above, wife's conditional right to retain the entirety of the transitional bonus and the possibility she may be obligated to repay any unearned portion of it is similar to the nonvested and unmatured pension right at issue in *Brown* and the cases applying its reasoning to other contractually created contingent interests. *In re Marriage of Skaden, supra,* 19 Cal.3d 679 noted "*Brown* . . . indicated [there were] two basic solutions" to the division of a community's interest in a contingent benefit. (*Id.* at p. 688.) "[F]irst, a determination by the trial court of the present value of the rights or [obligations] adjudged to be marital property [or liability] and an equal division or adjustment of the same [citations][,] and second, 'if the court concludes that because of uncertainties affecting the vesting or maturation of [such] rights . . . it should not attempt to divide the present value . . . it can instead award [or confirm to] each spouse an appropriate portion of each . . . payment [or obligation] as it is paid [or incurred].'" (*Ibid.*)

*Skaden* further held "that in cases of this kind the matter of the proper division of rights [or obligations] . . . as marital property [or liability] should be left to the sound discretion of the trial court, exercised in light of the particular circumstances of the case." (*In re Marriage of Skaden, supra,* 19 Cal.3d at p. 688.) Thus, in this case we will remand the matter to the trial court to determine the extent of the community interest or obligation in the transitional bonus and to decide the appropriate option of dividing or appropriating it.

*3. The Other Bonuses*

The trial court ruled the first production bonus and level 4front bonus constituted wife's separate property and confirmed the entire amount of each payment to her. The court made no finding on the deferred recruitment bonus, but noted wife would

13

not be eligible to receive it until 2016 and then only if she is still employed by Wells Fargo.

Husband argues these bonuses "were not compensation for future employment," but "for the book built up during marriage." He claims wife's post-separation salary fully compensated her for the obligations of remaining a Wells Fargo financial advisor in good standing and maintaining a specific production level. Wife asserts she "must continue to work and perform at a specified level in order to receive the benefits contracted for during marriage," and thus "[t]he bonuses paid to [her]" constitute "unearned income until the condition[s are] met."

We reject husband's argument concerning these bonuses. It is supported only by Buchler's testimony. Ellis, wife's securities expert, testified the consideration for wife's book of business was the transitional bonus. His testimony supports the trial court's rejection of husband's claim and, as noted, we must accept the trial court express and implied factual findings when supported by the evidence. (*In re Marriage of Rossin, supra,* 172 Cal.App.4th at p. 734.)

Furthermore, as for the deferred recruitment award, the offer summary provided wife's right to receive would "vest on January 31, 2016 . . . provided [she] remain[ed] actively employed with [Wells Fargo] . . . ." But, with certain exceptions, "[i]n the event that [wife's] employment is terminated by [her] or [Wells Fargo] for any reason whatsoever prior to the [v]esting [d]ate, [wife] agree[d] that [she] will not be entitled to any portion of the '[d]eferred [r]ecruitment [a]ward . . . ." Thus, while the offer summary provides for wife's receipt of a deferred recruitment bonus unless she remains a Wells Fargo employee until January 31, 2016, she will not be entitled to receive this payment. We conclude this bonus constitutes only an expectancy because prior to the vesting date wife "has no *enforceable right*" to receive it. (*In re Marriage of Brown, supra,* 15 Cal.3d at p. 845.)

14

Nonetheless, much of our prior discussion concerning the characterization of the transitional bonus is also applicable to the first production bonus and the level 4front bonus. The critical question here is when wife's right to each bonus accrued, not her receipt of them. "What is determinative is . . . a single concrete fact—time. The right to [employment] benefits 'represent[s] a property interest; to the extent that such [a] right[] derive[s] from employment' during marriage before separation, it 'comprise[s] a community asset . . . .'" (*In re Marriage of Lehman, supra,* 18 Cal.4th at p. 177.)

The first production bonus was provided for in the offer summary. Wells Fargo announced the creation of the level 4front bonus in mid-2009, before the parties separated. Wife did not receive payment for either bonus until after separation. But the contractual right to receive each bonus and at least some of the effort necessary to qualify for them occurred before the couple separated.

The trial court's reliance on *In re Marriage of Doherty, supra,* 103 Cal.App.4th 895 and *Garfein v. Garfein, supra,* 16 Cal.App.3d 155 lacks merit. In *Doherty*, the wife's employer transferred her job to California and, to assist the family in making the cross-country move, "offered relocation housing benefits . . . [which] included . . . a 'mortgage buydown' or subsidy payable directly to a specified lender over 20 years." (*In re Marriage of Doherty, supra,* 103 Cal.App.4th at p. 897.) Two years later, the couple separated and divorced. The trial court characterized the entire mortgage subsidy as a community asset, describing it as "'a contract right that was received during the marriage, from the efforts of the community.'" (*Id.* at p. 898.) The Court of Appeal disagreed, holding there was "no community interest in the . . . mortgage subsidy received after the parties' separation." (*Id.* at p. 900.) "The mortgage subsidy . . . rests upon [the wife's] continued employment with [her employer] . . . and [the employer's] desire to continue paying the relocation benefit until its policy is 'changed or revoked.'" (*Id.* at p. 899.) Thus, "[t]he housing allowance . . . is a form of supplemental income to [the wife] and her separate property after separation." (*Ibid.*)

15

*Garfein* involved a divorce action where during marriage the wife, a movie actress, entered into a six-year "'play or pay' contract" with a studio. (*Garfein v. Garfein, supra,* 16 Cal.App.3d at p. 157.) Under the agreement, the studio promised to pay her a specified sum of money each year in return for her promise to remain available to make at least one picture. Two years later the couple separated, but the husband argued he was entitled to one-half of the monies wife received during the remaining four years of her contract. The Court of Appeal disagreed. "[A]ppearance in a picture was only one alternative of her obligations to her employer under the contract. . . . We hold that the wife 'earns' her agreed compensation by refraining from performing for anyone except the employer during the period of the contract, unless with the employer's consent. Since the payments made after [separation] were 'earned' after that date, they were separate property." (*Id.* at p. 159, fns. omitted.)

As noted, unlike *Doherty* and *Garfein,* wife's right to the first production and level 4front bonuses was earned, at least in part, before the parties separated. But as with the transitional bonus, she received the entire bonus in a lump-sum payment subject to certain conditions. Thus, upon remand the trial court must make a determination of the portion of each bonus earned before separation and evaluate the potential wife may fail to satisfy the conditions required to retain the advances received by her. The court will then need to choose the appropriate option of dividing or confirming the community's interest or liability in each bonus.

In wife's brief, she notes the trial court's awards of child and spousal support to husband were based on a calculation of her monthly income that included the transitional bonus income credited to her. She expresses the concern that if husband prevails in this appeal he would be allowed to "double-dip[]" by "receiv[ing]" both her "post-separation earnings as property *and* support." However, the trial court's judgment dealt with both the division of the parties' assets and obligations, plus child and spousal support. Since we are reversing the judgment for further proceedings, the trial court will

16

be able to adjust not only its division of the parties' community estate, but also the support obligations. Thus, at this time, the potential for "double-dipping" is speculative.

DISPOSITION

The judgment is reversed and the matter is remanded to the superior court for further proceedings consistent with the views expressed in this opinion. Appellant shall recover his costs on appeal.

RYLAARSDAM, J.

WE CONCUR:

O'LEARY, P. J.

IKOLA, J.

17

Filed 1/7/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of MARK and RHONDA FINBY. | |
| MARK FINBY,<br><br>    Appellant,<br><br>        v.<br><br>RHONDA FINBY,<br><br>    Respondent. | G046814<br><br>(Super. Ct. No. 10D004955)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION; DENYING REHEARING |

The opinion in the above-entitled matter filed on December 18, 2013, was not certified for publication. Requests have been received to publish the opinion and it appears the opinion meets the standards for publication set forth in California Rules of Court, rule 8.1105(c). The requests are GRANTED.

The petitions for rehearing are DENIED.

**CERTIFIED FOR PUBLICATION**

RYLAARSDAM, J.

WE CONCUR:

O'LEARY, P. J.

IKOLA, J.