Filed 7/7/14  Marriage of Hanna CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of IRIS and ASHRAF HANNA. | |
| IRIS HANNA,<br><br>        Respondent,<br><br>v.<br><br>ASHRAF HANNA,<br><br>        Appellant. | A135944<br><br>(San Mateo County<br>Super. Ct. No. 0108094) |

Iris Hanna and Ashraf Hanna married in 1994 and separated in 2010.[1]  The trial court entered a judgment of dissolution and issued orders concerning the division of property (including the family residence), as well as child and spousal support and other issues.  Ashraf appeals, contending the court erred in its disposition of certain property interests arising from a residential loan from Ashraf's employer.  We agree in part and therefore reverse.

## I.  BACKGROUND

### A.     The Genentech Loan

In 2006, Ashraf began working at Genentech; Iris and Ashraf and their children moved from Texas to California.  At the time of the trial court hearing in November

---

[1] "For clarity, 'we refer to the parties by their first names, as a convenience to the reader.  We do not intend this informality to reflect a lack of respect.' " (*In re Marriage of Facter* (2013) 212 Cal.App.4th 967, 970, fn. 1.)

2011, Ashraf was the head of Genentech's North American commercial finance group, supervising 70 employees. Iris was working full-time as a pediatrician.

As a form of relocation assistance, Genentech extended a $1 million residential loan (the Genentech loan). The promissory note and related documents identify Ashraf as the "Borrower." Iris also signed the documents, stating that, as the "spouse of Borrower," she approved and agreed to be bound by the loan terms, and agreed any community property or other interest she might have in the parties' residence would be bound by the loan terms.

The promissory note, dated June 13, 2006, specifies Ashraf will pay Genentech $1 million, plus interest, subject to certain terms and conditions. The note is secured by a deed of trust encumbering the house the parties purchased in Menlo Park, and by a conditional assignment of stock options issued by Genentech to Ashraf.

The note specifies the principal amount of the loan, plus interest, is due in five years (i.e., in June 2011), or immediately if Ashraf leaves Genentech or is terminated (subject to certain exceptions), or if the house is sold. When the loan comes due at the end of the five-year period, Ashraf must redeem the stock options, and the after-tax proceeds of the sale will be applied to the loan balance. If the sale proceeds are insufficient to pay off the outstanding principal and 50 percent of the accrued interest, the note will be extended another five years. During this extended period, Genentech will annually forgive one-fifth of the extended principal amount (the unpaid portions of the original principal and interest), and the interest accruing on that extended amount. In 2008, Ashraf and Iris agreed to modified loan terms.

Roche acquired Genentech in 2009; this event required Ashraf to exercise his stock options, and the post-tax proceeds were applied to the loan. At the time of the 2011 hearing, the remaining loan balance was approximately $600,000. Pursuant to the loan documents, 20 percent of the balance (as well as accrued interest) will be forgiven each year during the second five-year term (from June 2011 to June 2016). But any remaining balance will become due if Ashraf leaves Genentech or is terminated (subject to certain

2

exceptions), or if the house is sold. This same result apparently will occur if title to the house is transferred into Iris's name alone.

When the parties separated in 2010, Iris remained in the house. By the time of the trial court hearing, the parties had stipulated to a custody arrangement under which their three minor children were with Iris 69 percent of the time and with Ashraf 31 percent of the time.

## B.    The Trial Court's Ruling

Both parties sought to be awarded the house. The parties disagreed as to the proper treatment of the Genentech loan and its forgiveness feature. Ashraf argued the forgiveness was his separate property income derived from his work at Genentech after the parties' 2010 separation. Iris contended the forgiveness was a component of the 2006 loan agreement and did not constitute postseparation earnings.

In a detailed statement of decision, the trial court addressed the disposition of the house and the Genentech loan. The court concluded it would be in the best interests of the children if Iris, with whom they spent the majority of their time, remained in the house. The house was close to the children's schools and Iris's work. The court also concluded that, because of the forgiveness feature of the Genentech loan, it would be in the community's best interest to keep the house for the next five years. As we discuss further below, the court concluded the Genentech loan was a community obligation and the forgiveness was also community property.

The court awarded Iris possession of the house, but ordered that title remain in the names of both parties until the Genentech loan is satisfied or forgiven. In the interim, Iris is responsible for all payments due on the parties' first mortgage, as well as insurance, maintenance and property taxes. Iris is to pay Ashraf his 50 percent share of the community property equity in the house.[2]

_____

[2] The fair market value of the house was $2,487,500; the balance on the first mortgage was $1.1 million; the balance of the Genentech loan was about $600,000. The community property equity thus was $787,500; the court ordered Iris to pay Ashraf one-half of this amount, i.e., $393,750.

To divide the benefits and liabilities arising from the Genentech loan and its forgiveness feature, the court ordered that each party be responsible for 50 percent of the income taxes on the forgiveness. The taxes will be assessed against Ashraf in each year of the forgiveness program, and Iris is to reimburse him for one-half the amount paid. Once the loan is fully satisfied or forgiven, Iris is to pay Ashraf an equalizing payment, consisting of one-half the forgiven principal and interest, plus 10 percent per annum interest on the equalizing payment (calculated from the date of each annual forgiveness). Ashraf will then convey the house to Iris as her separate property.

The court entered judgment. Ashraf appealed.

## II. DISCUSSION

Ashraf contends (1) the forgiveness is his separate property income, because it is conditioned on his continued employment at Genentech, and (2) the trial court failed to divide equally the community's interest in the Genentech loan.[3]

### A. Legal Standards

In general, property a spouse acquires during marriage before separation is community property. (Fam. Code, §§ 760, 770;[4] *In re Marriage of Green* (2013) 56 Cal.4th 1130, 1134.) A spouse's postseparation "earnings and accumulations" are separate property. (§ 771, subd. (a); *In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 733.)

"Under California's community property law, the characterization of 'property as separate, community, or quasi-community' 'is an integral part of the division of property on marital dissolution.' [Citation.] Courts recognize several factors relevant to this task [citation], but 'the most basic characterization factor is the time when property is acquired in relation to the parties' marital status' [citation]. The 'factual findings that underpin the characterization determination are reviewed for substantial evidence' [citation], but '[i]nasmuch as the basic "inquiry requires a critical consideration, in a

---

[3] Ashraf does not challenge the trial court's award of the house to Iris or the court's order dividing the equity in the home.

[4] All statutory references are to the Family Code unless otherwise stated.

4

factual context, of legal principles and their underlying values," the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law.  [Citation.]  As such, it is examined de novo' [citation]."  (*In re Marriage of Finby* (2013) 222 Cal.App.4th 977, 984 (*Finby*).)

If an interest in property is acquired over a period of time (partly during marriage), the court must apportion the community and separate interests in the property.  (See *In re Marriage of Lehman* (1998) 18 Cal.4th 169, 179–180, 187 [right to enhanced retirement benefits derived partly from employment during marriage and partly from the employee-spouse's postseparation efforts]; *In re Marriage of Rossin, supra,* 172 Cal.App.4th at p. 733.)  The trial court has discretion as to the method of apportionment it chooses, and we review the court's determination for abuse of discretion.  (*In re Marriage of Lehman, supra,* 18 Cal.4th at p. 187.)  " 'Whatever the method that it may use, however, the superior court must arrive at a result that is "reasonable and fairly representative of the relative contributions of the community and separate estates." ' "  (*In re Marriage of Sonne* (2010) 48 Cal.4th 118, 124.)

"Once the court determines the assets and liabilities of the community estate, it must value them and make an equal division of the estate.  (§§ 2550–2552, 2601, 2620 et seq.; [citation].)"  (*Finby, supra,* 222 Cal.App.4th at p. 984.)  Issues concerning the valuation and division of community property are reviewed for abuse of discretion.  (*Ibid.*; *In re Marriage of Sivyer-Foley & Foley* (2010) 189 Cal.App.4th 521, 526.)

**B.      The Loan Forgiveness**

**1.      The Trial Court's Ruling**

The trial court held the Genentech loan was a "community obligation."  The court concluded the loan forgiveness program, a contemplated method for repayment of the loan, was also community property.  The court noted, "[i]t was anticipated that the loan would be paid off from the exercise of community Genentech stock options and stock."  When the options were insufficient to repay the loan, the loan forgiveness program went into effect, extending the loan by five years.  The court stated:  "The loan was established as an integral part of the incentive program to have the parties move to California and

have [Ashraf] accept the position at Genentech. The loan forgiveness program was an integral part of satisfying the community loan commitment."

The court noted Ashraf's argument that the loan forgiveness was his "separate property income" because the forgiveness was contingent on his continuing to work at Genentech. The court rejected this contention, stating: "Because of the unique situation surrounding this loan and forgiveness program, and the fact that the court is dividing the taxes on the loan forgiveness equally, did not consider the loan forgiveness in establishing the marital standard of living, and is not treating the loan forgiveness as income to [Ashraf] for any purpose surrounding his obligation to pay child and spousal support, the court feels it is equitable to apportion all of the debt forgiveness to the community instead of characterizing it as [Ashraf's] separate property."

### 2. Case Law Addressing Contingent Interests

The fact a contractual right obtained during marriage is subject to contingencies does not preclude it from being a divisible community asset. (See *In re Marriage of Brown* (1976) 15 Cal.3d 838, 842, 846 & fn. 8 [pension rights, whether or not vested, are property interests subject to division in a dissolution proceeding, where such rights derive from employment during marriage; "The fact that a contractual right is contingent upon future events does not degrade that right to an expectancy."]; *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 745–746 [spouse's contractual right to withdraw from law firm was divisible property right; "[C]ontractual rights, where the right to payment is earned during marriage, are community property though contingent upon future events."]; *In re Marriage of Skaden* (1977) 19 Cal.3d 679, 687 [contractual termination benefits were " 'a form of deferred compensation for services rendered,' " because the right to the benefits " 'derived from the terms of the employment contract' "]; accord, *In re Marriage of Lehman, supra,* 18 Cal.4th at p. 177 [to the extent the right to employment benefits derives from employment during marriage before separation, it is a community asset].)

In the recent decision in *Finby,* our colleagues in the Fourth District addressed the proper characterization and valuation of bonuses that were paid to an employee spouse (wife) and were arranged as loans to be forgiven over a period of time. (*Finby, supra,*

6

222 Cal.App.4th at pp. 980–982, 986–991.)  Wife, a financial advisor who had developed a list of clients (her " 'book of business' "), changed employers during marriage (in 2009); she and husband separated in 2010.  (*Id.* at p. 980.)  Her employment contract with her new employer (Wells Fargo) provided for several bonuses.  (*Id.* at p. 981.)  The first, a "transitional bonus," was paid to wife immediately (before separation), but her entitlement to retain the entire amount was conditioned on her remaining employed as a financial advisor by Wells Fargo for 112 months, maintaining minimum production levels, and remaining current on any other obligations she owed to the firm.  (*Ibid.*)  The payment was arranged as a loan evidenced by a promissory note; Wells Fargo agreed to forgive a portion of the total amount each month for 112 months.  (*Ibid.*)  For tax purposes, Wells Fargo credited wife with an equal amount of income each month.  (*Ibid.*)  If wife stopped working for Wells Fargo, the entire unpaid balance of the loan would be due.  (*Ibid.*)  Wife later received two other bonuses, a production bonus and a "level 4front bonus," which also were arranged as loans evidenced by promissory notes with the balances to be forgiven over time, and with the forgiveness conditioned on wife remaining with Wells Fargo.  (*Id.* at pp. 981–982.)

The trial court in *Finby* ruled the portion of the transitional bonus earned during the first 11 months of wife's employment with Wells Fargo was received before separation and thus constituted community property.  (*Finby, supra,* 222 Cal.App.4th at p. 983.)  The court concluded the balance of that bonus and the remaining bonuses were wife's separate property because they were not paid or due until after the parties separated.  (*Ibid.*)

The appellate court reversed.  (*Finby, supra,* 222 Cal.App.4th at pp. 980, 992.)  The court concluded Wells Fargo paid the transitional bonus to compensate wife for bringing to the firm her customers, or book of business, which she apparently acquired during marriage.  (*Id.* at pp. 986–988.)  The community thus had an interest in the transitional bonus.  (*Id.* at pp. 987–988.)  After discussing the above case law involving pension benefits and other contractually created contingent interests, the appellate court held the fact wife's right to retain the bonus was subject to contingencies, including

7

wife's continued work for Wells Fargo, did not "preclude [the bonus] from being a divisible community asset." (*Id.* at p. 987.)

The *Finby* court further held the trial court's limited valuation of the community's interest (limited to the payments wife earned during the 11 months between the date of her hire and the parties' separation) was an abuse of discretion. (*Finby, supra,* 222 Cal.App.4th at p. 988.) The appellate court stated: "Wife's right to receive the bonus, and the obligation to repay it if she failed to satisfy the attached conditions, arose when she signed the offer summary, received immediate payment of the bonus, and began working for Wells Fargo. Further, the ability to satisfy the requirements entitling her to retain the entire bonus is within her control." (*Ibid.*)

The *Finby* court held, however, that the trial court was not required to "simply award one-half of the $2.8 million to husband." (*Finby, supra,* 222 Cal.App.4th at p. 988.) Instead, the court remanded the matter to the trial court "[(1)] to determine the extent of the community interest or obligation in the transitional bonus and [(2)] to decide the appropriate option of dividing or appropriating it."[5] (*Id.* at p. 989.)

Finally, as to the production and level 4front bonuses, the *Finby* court emphasized the critical question was when wife's right to each bonus accrued, not her receipt of them. (*Finby, supra,* 222 Cal.App.4th at p. 990.) Although wife did not receive payment of these bonuses until after separation, "the contractual right to receive each bonus and at least some of the effort necessary to qualify for them occurred before the couple separated." (*Ibid.*) On remand, the trial court was to "make a determination of the portion of each bonus earned before separation and evaluate the potential wife may fail to satisfy the conditions required to retain the advances received by her. The court will then

---

[5] In dividing the community's interest, the court could (1) determine the present value of the rights and obligations arising from the bonus and equally divide them, or (2) if appropriate due to uncertainties affecting the vesting and maturation of those rights, the court could " ' "instead award [or confirm to] each spouse an appropriate portion of each . . . payment [or obligation] as it is paid [or incurred]." ' " (*Finby, supra,* 222 Cal.App.4th at pp. 988–989.)

need to choose the appropriate option of dividing or confirming the community's interest or liability in each bonus." (*Id.* at p. 991.)

### 3. The Genentech Loan

#### a. The Community's Interest in the Loan

Applying the principles set forth in the above cases, we hold the trial court was correct in concluding the community has an interest in the rights and obligations arising from the Genentech loan. Genentech's relocation housing benefit,[6] a loan that may be forgiven over time, is similar to the bonuses arranged as loans to be forgiven over time in *Finby*. (See *Finby, supra,* 222 Cal.App.4th at pp. 980–982, 986–991.) As noted, the *Finby* court held the wife's rights and obligations in connection with the transitional bonus arose during marriage when she signed the relevant contract, received the bonus, and started working at Wells Fargo. (*Id*. at p. 988.)

Similarly, here, the right to receive the loan proceeds, and the obligation to repay the loaned funds if Ashraf fails to satisfy the conditions specified in the loan documents, arose during the parties' marriage when Ashraf (and Iris, as his spouse) signed the promissory note and received the loan proceeds, and Ashraf began working at Genentech. The fact the right to retain the loan proceeds (i.e., the right to periodic forgiveness of the loan balance) is subject to contingencies, including Ashraf's continuing to work for Genentech, does not preclude the loan from being a divisible community asset.[7] (See *In re Marriage of Brown, supra,* 15 Cal.3d at pp. 842, 846 & fn. 8; *Finby, supra,* 222 Cal.App.4th at p. 987.)

#### b. Apportionment

Because the community has an interest in the loan's benefits and obligations, the trial court needed to "determine the extent of the community interest or obligation," and

---

[6] Paragraph 16 of the promissory note specifies the purpose of the Genentech loan is "to provide relocation housing assistance to Borrower."

[7] In his reply brief on appeal, Ashraf appears to concede the community has some interest in the loan. He describes the loan as a community obligation, and he argues one beneficial term of the loan (the fact no payments were required during the forgiveness period) is a community benefit that should be divided.

9

then to decide on the appropriate method of dividing that interest. (See *Finby, supra,* 222 Cal.App.4th at pp. 988–989; see also *id*. at p. 991.) As to the first of these steps (determination of the extent of the community interest), we note the fact that the community has an interest in an asset does not mean it is a community asset in its entirety. (See *In re Marriage of Lehman, supra,* 18 Cal.4th at p. 180.) The question what extent such an asset belongs to the community and separate estates is one of apportionment. (See *ibid.*)

We conclude the court's apportionment of the loan constituted an abuse of discretion. The court did not apportion the loan in a way that was " 'fairly representative of the relative contributions of the community and separate estates.' " (See *In re Marriage of Lehman, supra,* 18 Cal.4th at p. 187.) Instead, the court appeared to conclude its apportionment did not need to account for any contribution by Ashraf's separate estate (i.e., his work at Genentech after separation), because apportioning the loan entirely to the community was equitable in light of other factors, including the court's treatment of the loan forgiveness in other portions of its decision addressing the marital standard of living and support issues.

Iris argues the court, by mentioning those factors, was not stating the bases for its decision, but was only explaining why the result it reached was "equitable, in addition to being legally correct and a proper exercise of discretion." We disagree. As we read the decision, the court concluded apportioning the loan entirely to the community was appropriate because it was equitable (in part because of the cited factors), and the apportionment did not need to reflect any contribution by Ashraf's separate property estate.

Iris also appears to contend the court's order was proper because the court found the loan was consideration solely for the community's relocation to California (as evidenced by both parties' signatures on the promissory note), and not for any of Ashraf's work at Genentech. But the court's finding was not so narrow. The court stated the loan was part of an incentive program to induce the parties to move to California *and* to have Ashraf accept the position at Genentech. Further, the loan terms contemplate

Ashraf would work at Genentech for a period of time; the loan would become due if Ashraf left Genentech before it was satisfied or forgiven. Genentech did not make an unconditional payment upon the parties' relocation.

Although the court had discretion in choosing a method of apportionment that fairly reflected the relative contributions of the community and separate estates (see *In re Marriage of Sonne, supra,* 48 Cal.4th at p. 124), the court did not exercise its discretion within that framework. Accordingly, the court abused its discretion. (See *In re Marriage of Facter, supra,* 212 Cal.App.4th at p. 991 [" ' "A discretionary order that is based on the application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion, and is subject to reversal even though there may be substantial evidence to support that order." ' "]; see also *In re Marriage of Gray* (2007) 155 Cal.App.4th 504, 515 [trial court's failure to exercise discretion is itself an abuse of discretion].)

We do not agree, however, with Ashraf's apparent contention that the court had to apportion the loan in such a way that the forgiveness is entirely his separate property. The fact the forgiveness installments will occur after separation, and are conditioned on Ashraf's continuing to work for Genentech, does not establish the community has no interest in the forgiveness feature of the loan. (See *Finby, supra,* 222 Cal.App.4th at p. 988 [trial court abused its discretion by holding community's interest in transitional bonus was limited to payments wife earned prior to separation].)

The cases on which Ashraf relies, *In re Marriage of Doherty* (2002) 103 Cal.App.4th 895 (*Doherty*), and *Garfein v. Garfein* (1971) 16 Cal.App.3d 155 (*Garfein*), do not establish the trial court here was obligated to conclude all of the loan forgiveness was Ashraf's separate property. In *Doherty*, the wife's employer transferred her job to California and, to assist the family in making the cross-country move, "offered relocation benefits," including a " 'mortgage buydown' or subsidy payable directly to a specified lender over 20 years." (*Id.* at p. 897.) Two years later, the couple separated and divorced. (*Id.* at pp. 897–898.) The trial court characterized the entire mortgage subsidy as a community asset, describing it as " 'a contract right that was received during the

11

marriage, from the efforts of the community.' " (*Id.* at p. 898.) The Court of Appeal disagreed, holding there was "no community interest in the . . . mortgage subsidy received after the parties' separation." (*Id.* at p. 900.) "The mortgage subsidy . . . rests upon [the wife's] continued employment with [her employer] . . . and [the employer's] desire to continue paying the relocation benefit until its policy is 'changed or revoked.' " (*Id.* at p. 899.) The housing allowance therefore was "a form of supplemental income to [the wife] and her separate property after separation." (*Ibid.*)

In *Garfein*, the wife, a movie actress, entered during marriage into a six-year " 'play or pay' contract" with a studio. (*Garfein, supra,* 16 Cal.App.3d at p. 157.) Under the agreement, the studio promised to pay her a specified sum of money each year in return for her promise to remain available to make at least one picture. (*Ibid.*) Two years later the couple separated, but the husband argued he was entitled to one-half the payments wife received during the remaining four years of her contract. (*Id.* at p. 158.) The Court of Appeal disagreed. "[A]ppearance in a picture was only one alternative of her obligations to her employer under the contract . . . . We hold that the wife 'earns' her agreed compensation by refraining from performing for anyone except the employer during the period of the contract, unless with the employer's consent. Since the payments made after [separation] were 'earned' after that date, they were separate property." (*Id.* at p. 159, fns. omitted.)

The *Finby* court distinguished *Doherty* and *Garfein* because, even as to the production and level 4front bonuses (which the wife received in lump-sum payments after separation), the right to the bonuses was earned, at least in part, before the parties separated. (See *Finby, supra,* 222 Cal.App.4th at pp. 981–982, 990–991.) Similarly, here, the contractual right to receive the loan proceeds arose, and at least some of the effort necessary to retain them occurred, before Iris and Ashraf separated. (See *id.* at p. 990.) Moreover, as noted above, the parties here received the loan proceeds before separation, an arrangement similar to the transitional bonus in *Finby* (*id.* at p. 981), and different from the post separation payments at issue in *Doherty* and *Garfein*. (See *Doherty, supra,* 103 Cal.App.4th at p. 900 [community had no interest in mortgage

12

subsidy payments received after separation]; *Garfein, supra,* 16 Cal.App.3d at p. 159 [payments made after separation were separate property].)  *Doherty* and *Garfein* did not require the trial court to conclude the loan or the forgiveness was entirely Ashraf's separate property.

On remand, the trial court shall determine the extent of the community's interest in the Genentech loan.  (See *Finby, supra,* 222 Cal.App.4th at pp. 988–989, 990–991.)  The court shall exercise its discretion in apportioning the benefits and obligations arising from the loan in a manner that fairly reflects the relative contributions of the community estate and Ashraf's separate estate.  (See *In re Marriage of Sonne, supra,* 48 Cal.4th at p. 124; *In re Marriage of Lehman, supra,* 18 Cal.4th at p. 187.)  Once the court has ascertained the extent of the community's interest, the court shall exercise its discretion in determining the appropriate method of division of that interest.  (See *Finby,* at pp. 988– 989, 990–991.)

## C.    Division of the Community's Interest

Ashraf's remaining appellate argument is that the trial court did not equally divide the community's interest in the loan.  Specifically, he claims that, because the court awarded Iris the house, she has the benefit of the use of the loan funds with no obligation to make payments, while Ashraf enjoys no corresponding payment-free loan.

For the reasons stated above, we are reversing the judgment and remanding for the trial court to determine the extent of the community's interest in the loan, and then to divide that interest.  We need not address Ashraf's challenge to the court's previous division of the community's interest in the loan.[8]

## III.  DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings consistent with the views expressed in this opinion.  The parties shall bear their own costs on appeal.

---

[8] We note, however, that the court's order appeared to address Ashraf's loss of use of his portion of the loan forgiveness by requiring Iris to pay 10 percent per annum interest on her equalizing payment to Ashraf at the end of the forgiveness period.

13

_____
     Becton, J.*


We concur:


_____
  Margulies, Acting P.J.


_____
  Banke, J.


* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14