IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 12, 2022 Session

## MELANIE MILLER HOLLIS v. CHARLES MYERS HOLLIS, JR.

**Appeal from the Chancery Court for Bradley County**
**No. 2018-CV-93     Jerri S. Bryant, Chancellor**

_____

### No. E2020-01123-COA-R3-CV

_____

This appeal concerns a divorce. Melanie Miller Hollis ("Wife") sued Charles Myers Hollis, Jr. ("Husband") for divorce in the Chancery Court for Bradley County ("the Trial Court"). After a trial, the Trial Court granted Husband a divorce based upon Wife's inappropriate marital conduct. The Trial Court also divided the marital estate and awarded Wife alimony and child support. Wife appeals, arguing that the Trial Court erred by failing to classify and value as part of the marital estate Husband's "book of business" from his job as a financial advisor at UBS, a financial services firm. Husband raises separate issues regarding child support, alimony, and the division of the marital estate. Discerning no abuse of discretion or other reversible error, we affirm the judgment of the Trial Court in its entirety. We also remand for the Trial Court to determine and enter an award to Wife of her reasonable attorney's fees incurred on appeal, but only as they relate to issues of child support and alimony.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON, II, J., joined.

Donald Capparella and Kimberly Macdonald, Nashville, Tennessee; and Pamela R. O'Dwyer, Chattanooga, Tennessee, for the appellant, Melanie Miller Hollis.

Philip M. Jacobs, Cleveland, Tennessee, for the appellee, Charles Myers Hollis, Jr.

## OPINION

## Background

Husband and Wife married in 1996. In April 2018, Wife sued Husband for divorce in the Trial Court, alleging inappropriate marital conduct. Husband filed a counterclaim also alleging inappropriate marital conduct. The parties have two adult children and two minor children. Wife has an adult son from a prior marriage, as well. The parties' two minor children have Down's Syndrome and require extensive special care. The disputed issues on appeal pertain to child support, alimony, and the classification and division of the marital estate.

During the marriage, Husband took on the role of breadwinner for the family. Since 2008, Husband has worked as a financial advisor managing client assets for UBS, with a major client being the Church of God Benefits Board, Inc. Before that, Husband worked for Merrill Lynch. Upon coming to work for UBS, Husband received a loan up front. Husband's payments under the loan were tied to Husband meeting certain future performance goals. The loan was gradually forgiven and dropped to zero in 2017. At that time, Husband held informal discussions with Raymond James, another financial company, about possibly working there. Similar to Husband's arrangement with UBS, he would receive a forgivable loan up front tied to his meeting certain goals, were he to work for Raymond James. As it happened, the discussions broke off, and Husband stayed with UBS.

One of the main issues in this appeal is how to classify Husband's "book of business"—his relationships with clients, assets under management, and income produced to manage these assets—from his job as a financial advisor for UBS. The income produced for managing the assets under management over a period of twelve months is called the "Trailing Twelve," which is based on a percentage charged to clients on their assets under management balance. On appeal, Wife cites, among other things, Husband's discussions with Raymond James as evidence that Husband's book of business has a definite value that constitutes marital property subject to equitable division in this divorce. Husband, in turn, points out that in 2017, UBS left the "protocol" which allowed financial advisors to take contact information about clients with them when they left the company, and UBS now takes the position that a financial advisor who leaves the company cannot take any information with him or her. For this and other reasons, Husband contends that his "book of business" neither is a marital asset nor even property.

Following a nine-day bench trial held in April and October of 2019, this matter was disposed of in a series of orders. In February 2020, the Trial Court entered a highly detailed order, finding as relevant to the issues on appeal:

In this case, the Court was asked to decide the issues of grounds, custody of the parties' two special needs children, alimony, and division of the parties' debts and assets. The parties have been married twenty-four (24) years and have five (5) children between them. Three of the parties' children are adults, Caleb, Lydia and Natalie. The parties' two minor children HH and CH, have special needs. Caleb is Ms. Hollis's child from a previous marriage.

***

As part of the "take no prisoner" strategy in this case, both parties have called the children in to testify against their parents. The parents have caused the children to take sides and potentially harm possibilities of their future relationships. Mr. Hollis has been less than forthcoming about his assets and not always cooperative in discovery. As such, Mr. Hollis should be responsible for Ms. Hollis's attorney fees for the additional cost of discovery over and above what was needed due to his lack of transparency.

Mr. Hollis lost credibility by playing the semantics game, when he was asked about his Deferred Cash Agreements. He testified he had none. Later, he admitted he has notes and stock payments that he has deferred instead of taking them up front. These are referred to as "Strategic Awards". These are rewards for past performance and length of service. They are awarded yearly by UBS and based upon company-wide performance. They are given to advisors as a bonus. They are already earned but you must be an employee at the time you collect them, in order to receive them. They are marital assets.

Likewise, Mr. Hollis was not credible during his testimony about his actual income. It took several requests to get discovery completed and in the appropriate form. Mr. Hollis didn't make the appropriate oaths with the discovery. He was not forthcoming with the information about his "book of business" and his retirement information that necessitated the taking of multiple depositions to get and confirm the information. Contrary to Mr. Hollis's excuses, his supervisor with UBS admitted the information previously requested by Ms. Hollis was of such a nature that Mr. Hollis would not have received discipline for passing it onto Ms. Hollis's attorney in this case. Further, the information was readily available to Mr. Hollis, even though he stonewalled in giving it to Ms. Hollis's counsel and made the acquisition of basic information much more difficult and time consuming than necessary. Because of his actions, Ms. Hollis incurred attorney fees in an amount more than would have been reasonable in pursuing that same type of information.

Mr. Hollis spent resources, took Ms. Hollis's property, and called witnesses, to bully and embarrass Ms. Hollis which did not move the divorce case forward towards a final resolution. Mr. Hollis shall be responsible for additional attorney fees accordingly.

With regard to Ms. Hollis, she was not credible in describing her affairs, her monthly expenses, and Caleb's account and other monies. Also, she was not credible when she discussed moving bank accounts to join with Lydia and not fully disclosing them. When questioned about the budget, the "Court put her on", [and] she was not reliable about the amounts spent on a monthly basis.

***

HH is 13 years old and CH is 10 years old, and both have Down's syndrome. The Court must make adequate and sufficient provisions for the support of HH and CH, as they will need over their lifetime. Ms. Hollis describes both children as being "flight risks". HH goes to school from 8:00 a.m. until 1:00 p.m. and CH goes to school from 8:30 a.m. until 2:10 p.m. HH must eat every other hour and must have her food cut in a certain way so she does not choke. CH eats pureed food 7-8 times per day by bottle. Laundry is a constant issue with the children. CH only sleeps 4-5 hours per night.

The children also have certain other expenses. The Court credits Ms. Hollis's expense list for the children and finds it is more precise and more reasonable than Mr. Hollis's "guesstimates", which appear to be somewhat arbitrary and not reliable. Mr. Hollis admitted he did not know the purpose of some expenses he attributed to the children or Ms. Hollis. Also, Mr. Hollis's Exhibits 79, 81, and 92 omitted some expenses without reliability.

While Ms. Hollis does a good job finding things for the children to do to enhance their recreation and social development, Mr. Hollis cannot be required to pay for all the things Ms. Hollis can imagine. Ms. Hollis's past spending was basically unlimited. The budget the Court will set will be generous, but not unlimited. The Court will set a budget for the children in an amount the Court finds to be reasonable, after reviewing all of the exhibits in this case concerning money spent versus money actually needed. The Child Support Guidelines set a presumptive amount of child support at $3,200 per month.

***

It is certainly clear that these two (2) children will require more than the presumptive amount of child support to take care of them. It is additionally clear that these children will require support past the age of eighteen (18) and the Court, therefore, finds it is in the best interest of each child that the Court deviate upward from the Tennessee Child Support Guidelines and that support continues after they turn 18 years of age. After reviewing the extensive exhibits 24, 78, and 92, the Court finds the children **need** the following monthly expenses:

Food, Diapers, Eating out-$975
Clothing and Incidentals-$1,030
Dental-$60
Gas-$100
Laundry-$150
Entertainment-$300
School Expenses/Tuition-$250
Travel-$1,700
Child Care-$1,240
2/3 home expenses pd. by Mr. Hollis-$1,100
TOTAL CHILD SUPPORT $6,905

The above amounts include a portion of the household expenses, such as mortgage payment, electricity, insurance, HOA fees, maintenance, and lawn care, which Mr. Hollis is currently paying in the approximate amount of $1,900 per month. This also assumes Mr. Hollis exercises his two weekends per month co-parenting and follows the parenting plan.

***

Because of the extensive expense of taking care of these children, Ms. Hollis's choice to stay home and care for them is reasonable. It was a joint decision made with Mr. Hollis. Mr. Hollis has an average gross monthly income in the amount of $73,530.48. He has been the primary breadwinner during this marriage and does quite well as a financial advisor. Ms. Hollis is educated and has the capacity to earn a good income; however, she will need additional education to bring her securities licensing current. She will need enough money to cover her children's full-time specialized care, etc. There is no proof this is a possibility.

Under the Tennessee Child Support Guidelines, Section 1240-2-4.07(g)(2), this Court is to look at each parties' income in determining the correct amount of child support. During his testimony, Mr. Hollis appeared

cagey and attempted to hide his true amount of income. In 2017, Mr. Hollis's W-2 for IRS purposes reflected income of $871,000; however, Mr. Hollis testified that his income was only $310,000 in 2017. He answered his interrogatories, regarding his income, with his net number instead of a gross. The Court finds he was less than forthcoming concerning his true amount of income. Mr. Hollis's payment structure includes several parts: (1) he receives a W-2 from UBS based on his production, meaning his percentage of income generated by his assets under management. Additionally, Mr. Hollis's employer paid him, through the year 2017, an amount that Mr. Hollis was required to repay on his recruitment bonus/transitional loan he received when he moved to UBS. He also gets strategic awards and other bonuses, including stock.

Ms. Hollis used an expert, Mr. Vance, in this case to help her prove her alimony need and children's need. Mr. Vance calculated the children's financial need predominantly from information he received from Ms. Hollis. The Court finds Ms. Hollis partially credible in her testimony regarding the children's expenses.

Under the Child Support Guidelines, Section 1240-2-4-.07(2)(d)(2) and (g), the Court can require amounts to be placed in an educational or other trust for the benefit of the children. Also, as previously stated, these children are special needs children. The Court Orders that $1,000 per month ($500 for each child) shall be placed in an ABLE account for the future benefit of the children. This will begin after the Franklin, TN home sells. This is necessary for the children, should anything happen to Mr. Hollis.

\*\*\*

[Regarding Husband's "Book of Business"]

Assets under management earn what the industry refers to as trail income. The trail income is the fund from which the financial advisor and his umbrella organization (in this case UBS) are paid. Mr. Hollis, Raymond James, and UBS all agree that this "book of business" is not owned by Mr. Hollis, or Raymond James, or UBS. UBS is the custodian of the assets.

In another scenario, Mr. Hollis can monetize this "book of business" upon his retirement. He would come under the UBS Alpha Program, which would provide a method for Mr. Hollis to transfer his assets to one or more brokers within the UBS framework and be paid to help service those clients for a period of five (5) years. This payment would be based upon a formula utilizing his trailing twelve (12) month income. He has several hundred million dollars under management. At the end of December 2017, Mr. Hollis

came out from under a covenant not to compete with UBS and is no longer subject to any other employment agreement. This allows Mr. Hollis to move to another firm, in an effort to monetize his "book of business".

The Court finds that this case is somewhat similar, but distinguishable from *Fuller v. Fuller*, E2016-00243-COA-R3-CV (2016) WL7403791. The financial advisor in *Fuller* admitted that his assets, which were producing income, were capable of being sold and [a financial planner] testified there was a value that was reasonable in the industry for this Court to place on that asset. The assets in *Fuller* continued to generate income whether or not the financial advisor did anything in the future. In this case, Mr. Hollis's clients may leave and go to another financial advisor at any time. The financial advisor in the *Fuller* case sold products. Mr. Hollis's "book of business" requires him to keep clients, work their investments to produce income, and remain employed.

Mr. Hollis testified he has no plans to move from UBS. Mr. Anderson [part of Husband's team at UBS], likewise, testified he did not wish to leave UBS. It is harder now for Mr. Hollis to leave UBS because UBS came "out of protocol" which prohibits him from taking his client list, address and phone numbers with him like he did when he changed firms ten years ago.

Likewise, Mr. Hollis can retire, and if he works for the five year period required by UBS, and transitions his clients to another UBS advisor, he will be paid a portion of the income earned because of his efforts. This also has indicia of income. It is paid up front for work to be done in the future. The Court, therefore, holds this "book of business" is not a marital asset. The Court finds the monetization of this before retirement to be more akin to an advancement which must be paid back with interest. After retirement it is income paid for work that he transitions.

The Trial Court found further that, after the paying off of her home, Wife would need $6,060 per month in alimony; that Husband's average yearly income over the past three (3) years was $713,000; that the "most representative amount" of Husband's future income was the $617,981 in gross income he earned in 2018; that after subtracting his monthly expenses and child support, Husband has the ability to pay $15,000 per month; that Wife is an economically disadvantaged spouse; that Wife has a desire to become a personal trainer; and, additionally, that it might be possible for Wife to get her "Series 7" stock license back. Wife's alimony award was set at $4,980 per month in alimony in futuro. It was to increase to $6,060 after the paying off of her home and then finally to $6,210 per month. With regard to alimony, the Trial Court found:

Ms. Hollis can work, but has two homebound children for which she will need child care. Before it becomes reasonable for her to work, Ms.

Hollis would have to bring home at least $270 per day just to pay for child care for these two children unless the children remain in school for partial days, then her child care would be less. There is little proof on her ability to retrain for her former job at this time. The parties chose for Ms. Hollis to remain home to care for the parties' special needs children. Therefore, it is reasonable for Ms. Hollis to remain at home and take care of these children. Looking at her obligations, her needs, and the financial resources of each party, Ms. Hollis will be receiving a larger portion of the marital estate in an effort to provide for herself and the two children. There has not been a showing that she has the ability to secure the necessary education and training to improve her earning capacity at this time. This is a 24-year marriage and both parties are in good physical and mental condition. Neither party has a disabling condition that interferes with their ability to produce an income. It is not desirable for Ms. Hollis to work outside the home unless she can produce enough income to cover her child care expenses. Both parties came into the marriage with very little separate assets. They will leave the marriage with a large amount of cash assets and some income for the future.

The parties established a high standard of living during the marriage. Unlike most people, the parties have two nice homes, each has a nice car, and they have taken several vacations per year with their children. They are also able to provide for their adult child's music expenses in an effort to help her break into the music industry. They have also been able to provide various expensive educational and socially developmental experiences for the two special needs children.

Both parties have made tangible and intangible contributions to the marriage. Mr. Hollis has a lucrative career that has allowed him to provide an exceptional lifestyle for Ms. Hollis and their children. He has been a good provider. Ms. Hollis has taken on an extraordinary job of raising two special needs children. She has been in charge of the education and training of the children. She has raised five (5) children, two of which will remain under a disability for the rest of their lives.

The Court has also considered the relative fault of the parties. It seems this marriage is one where there has been a high amount of stress caused by the needs of the children. Ms. Hollis is at fault in the demise of the marriage. She has had at least two paramours. Mr. Hollis, on the other hand, has been faithful in the marriage. However, he has been shown to be verbally abusive on at least two occasions. The circumstances of the parties are certainly capable of producing great stress.

***

-8-

When the parties' Franklin, TN home sells and the debt on the Cleveland, TN home is fully paid, neither party will be paying a mortgage, but Mr. Hollis will need a home. Until the house is sold, Mr. Hollis will be responsible to continue the mortgage payment and utilities (electric and gas) he is currently paying for the Cleveland property. Additionally, he will pay the HOA fee, cable and internet, and home security for the Cleveland, TN property. After all of these expenses are taken care of, Ms. Hollis will continue to need an additional $4,980 per month as alimony in futuro to cover her normal monthly expenses. After the sale of the Franklin, TN home and the extinguishment of the debt, Mr. Hollis will have more ability to take care of HH and CH and plan for their future. After the sale of the home, the alimony amount will increase to $6,210 per month.

At a hearing below, the Trial Court made certain remarks about possibly making "new law" with its child support award, remarks Husband cites on appeal as evidence of the Trial Court abusing its discretion. The exchange went as follows:

MR. JACOBS [Counsel for Husband]: Can I ask a question about the child support number?
THE COURT: Uh-huh. Yes. I'm sorry.
MR. JACOBS: When you use that number, that $8,500 number, does that include the --
THE COURT: Travel budget.
MR. JACOBS: -- travel budget?
THE COURT: Yes.
MR. JACOBS: You just broke it down monthly?
THE COURT: Yes. That includes -- I broke the travel budget down monthly.
MR. JACOBS: It includes everything but the ABLE --
THE COURT: Everything but the ABLE account.
MR. JACOBS: -- or what he has to pay if he doesn't exercise time?
THE COURT: Right.
MS. O'DWYER [Counsel for Wife]: And that will mean that we'll be putting in the parenting plan the 8,516 a month?
THE COURT: Whatever it was. It was 8-thousand-and-something dollars per month. I broke it down mostly for purposes of the Court of Appeals because I haven't seen this kind of deviation in front of the Court of Appeals. And it may be I make new law. It may be I have abused my discretion. I don't know what they'll do with this issue. And so I'm sure that either or both of you-all -- I know this case is going to go up on appeal no matter which way it goes, and so --

-9-

MS. O'DWYER: The modification of the order of the parenting plan was to reflect the language that the upward deviation is being done pursuant to T.C.A. 36-5-101 on the Court's finding of fact that the two minor children are disabled as defined by the Americans with Disabilities Act and, therefore, will require support beyond the age of 18 for the rest of their lives. That's the key language of the --

THE COURT: Okay. I intend that to be in there. That's exactly what I found. We don't know how long the rest of their lives is going to be. There was some innuendo that they might live into their 20s, but we don't know that.

In July 2020, the Trial Court entered an order denying a request made by Wife for an award of attorney's fees beyond those already awarded to her. Also in July 2020, in response to Wife's motion to compel or for contempt against Husband, the Trial Court entered an order stating that Husband knew or should have known about UBS account #090 when his counsel prepared an updated Master Asset List filed by stipulation; that omission of the account was inappropriate; and that Husband must provide full account statements from that account from April 2019 through February 2020. In October 2020, the Trial Court entered an order stating, in part, that "[t]he Defendant is not in contempt for the creation of account 090 or for the deposits made into account 090 since the Court's order of March 8, 2019."; "The Court will correct any typographical error with reference to the award of structured notes from 751, by restating that each party will receive one half of the structured notes in account 751 as they are redeemed, and the parties will equally divide any income derived from structured notes in account 751, since March 8, 2019."; and "[t]he parties can submit an amended master asset list that will incorporate all of the Court's decisions with reference to the equitable division of the marital estate following the February 13, 2020 order." In November 2020, the Trial Court entered its "Final Order of Divorce," stating as pertinent:

> 3. CHILD SUPPORT AWARD:
> a. Mr. Hollis shall pay the child support, and the payments for respite care for the children's mother, which are addressed in the Court's Order of February 13, 2020 in detail for the findings that formed the foundation for the support award which was intended to, and shall, be set at $8,516.00, which is the order of this court based on the Court's finding that Father has a gross monthly income of $73,530.48 over a three year average of $713,000 and is based on the three year average with emphasis on the 2018 earnings of $617,981.00. It is an upward deviation as defined in the February 13, 2020 Order;
>
> ***

-10-

c. Mr. Hollis shall pay the monthly sum of $8,516.00 as set out on the parenting plan, which is a deviation from the standard support due to the childrens' disability as defined in the Americans with Disability Act as defined in TCA 36-5-101 and the Federal Regulations. The Court found that the two disabled children will require care and support for the rest of their lives which is to a date "unknowable and unknown". The deviation shall compensate for the "intensity of care" and "the needs of the children for outside activities and trips and other special care for the severely disabled minor children … who were 14 and 13 years old at the time of the end of trial. This was uncontested. The care includes specialized teachers and sitters for the children who are non-verbal and difficult to manage safely otherwise. The Court specifically finds that the children will never be able to live independently.";

d. Mr. Hollis shall pay to Mrs. Hollis, as a necessary component of the children's support, "a travel budget that is slightly less than what the parents spent in the past" in the amount of $5,000 per trip, for a total of $20,000 per year, to be paid as part of the child support obligation which shall be utilized for taking the minor children on trips. (See p.14 of the Order of February 13, 2020)[.] That sum has been calculated and is included in the total child support awarded on the Permanent Parenting Plan. Both parties agreed this was good for the children.

***

f. The Court finds and Orders that Wife needs and should receive respite care and expenses because of intense and specialized child care for the time that Father does not exercise his parenting time as per the Permanent Parenting Plan in the amounts of $500 per weekend his parenting time is not exercised, and $2,500 per week for each week Father does not exercise his four (4) weeks parenting time for vacation.

***

6. HEALTH INSURANCE FOR WIFE:

The Court denied Wife's Motion to clarify the health benefits to Wife and grants the Health Savings Account originally granted to her based on Husband's failure to disclose the account. This account shall be a grant to the wife of a fund from which she can purchase her own health insurance. Wife asked for $750 per month for insurance and the Court considered this in its alimony award. The Wife may use the account to fund the purchase of her own health insurance.

-11-

7. TRUST FUND:

Under the child support guidelines, Section 1240-2-4-.07(2) and (g), the Court requires that Mr. Hollis shall pay the amount of $1,000.00 per month which is $500.00 per child into an ABLE account, as such is necessary should anything happen to both Mr. Hollis and Mrs. Hollis. This payment shall commence 30 days after the sale of the Franklin Home.

8. HUSBAND'S AWARD FROM THE SALE OF THE FRANKLIN HOME:

Based on the modification of the grant of the Structured Notes, as shown on the Master Asset List, as modified on September 2, 2020, wherein the Court modified to divide the notes, by agreement, one-half between Husband and Wife and which was adjusted to $124,362.50. For each party, the Court grants Husband an additional $124,362.50 from the proceeds of the sale of the Franklin home after the payment of mortgages on the both the Franklin home and the Cleveland home. Husband is also to receive the previously awarded $150,000.00 making a total payable to him of $274,362.50.

***

12. STRUCTURED NOTES:

a. The structured notes which are/were in UBS account 751 and/or account 090 shall be divided equally between the parties. These shall be accounted for by Husband and placed in a separate account in Wife's name at a brokerage firm of her choice. The division shall include any interest or dividends or any other benefit earned during the period from March 8, 2019 to February 20, 2020;

b. Husband shall produce the account records for the account ending in 090 which the Court found he "inappropriately omitted" from the final Master Asset List and that he shall account for everything monthly that was "generated", all payments received by redemption or value increased. This accounting is necessary to determine what Husband received or had the use of as "interest, income, benefit" ... from March 8, 2019 forward; and

c. The Court's "realignment" of the division of assets granting him $248,725 has been corrected to 124,362.50, set out above, is to be paid to him from the proceeds of the sale of the Franklin Home to equitably divide the marital assets as a result of the grant to Wife of one-half of the structured note value shown on the Master Asset List filed by the Court on February 13, 2020.

13. DIVISION OF PROPERTY ON MASTER ASSET LIST

a. Property Division is Ordered as set out on the Master Asset List originally attached to the February 13, 2020 Order and as amended on June 19, 2020 and again on September 2, 2020, as shown on the attached Rule 7 chart;

b. This Order divides the property without consideration of fault on either side with the exception of the grant of the UMB Medical Benefit Account because that account was not disclosed timely by Husband which is granted to wife by the Court and to assist her with her personal needs and if necessary, for her medical care.

***

14. ALIMONY

Based on a thorough examination of the factors set out at T.C.A. §36-5-121, and this Court's previous Order:

a. Husband shall pay to Wife as alimony *in futuro* the current sum of $4,980.00 per month;

b. Until the Franklin Home has sold and the proceeds have been divided, Husband shall continue to pay the expenses of the Cleveland Home as set out at p. 47 of the Court's Order of February 13[,] 2020 to cover the mortgage, the utilities, HOA fees, cable and internet and home security on the Cleveland, Tennessee property;

c. After the sale of the Franklin Home has sold and distribution of the proceeds, Husband shall increase Wife's alimony award to the monthly sum of $6,210.00 *in futuro* beginning with the next month's payment until further orders of the Court;

d. The Court finds that Mrs. Hollis' health and respite are necessary to the children's care and for that reason set the Alimony, with the consideration for the respite, which is also necessary as child support as set out in the Parenting Plan, and as set out above in 3.

15. BOOK OF BUSINESS AND ALFA RETIREMENT:

The Court, having declined to modify her February 13, 2020 Order, found both of these assets have no present value and finds they are "income" and not "an asset." The Court declined to "speculate on their value or whether they would come into being in the future. There had been no the proof [sic] of a present value. To put a coverture fraction on it would be difficult to do because it may or may not ever come into fruition".

Mr. Hollis must retire, work a certain amount of time and have clients stay with the company, to bring the ALFA into fruition, if/ after he elects to come under ALFA... his clients must (1) transition to the new broker, (2) that he must be alive, and (3) remain at UBS.

16. EXECUTION OF DOCUMENTS

Both parties shall execute any and all documents necessary to effectuate the Court's Order of divorce.

17. ATTORNEY FEES FOR MR. HOLLIS:

Mr. Hollis shall pay his own attorney fees to Logan and Thompson.

The costs of this cause are taxed against Mr. Hollis for which execution shall issue if necessary.

This is a Final Order under TRCP Rule 54.02 from which either party has the right to appeal.

Additional procedural history unfolded. In February 2021, the Trial Court entered an order stating, in part:

Based upon argument of counsel and the records as a whole, this Court finds that the Husband's request to modify the order to grant him additional monies from the sale of the marital residence is denied as a T.R.C.P. 59 Motion. The Husband's motion to alter the order to reflect that Plaintiff/Counter-Defendant ("Wife") is not entitled to any monies from Account No. 090 is an accounting issue between the parties. The structured notes were to be divided equally between the parties…. The Court will not address the issue raised with reference to whether there is one health savings account or two, nor will the Court resolve the dispute about the naming of the account(s) as U.B.S health savings account or U.M.B. health savings account, for lack of sufficient information at this time.

Wife timely appealed to this Court.

## Discussion

We restate and consolidate Wife's issues on appeal as follows: 1) whether the Trial Court erred in holding that Husband's "book of business" constitutes future income rather than marital property and 2) whether Wife should be awarded her attorney's fees incurred on appeal. We likewise restate and consolidate Husband's separate issues on appeal as follows: 1) whether the Trial Court erred in ordering an upward deviation in child support to $8,516 per month; 2) whether the Trial Court erred in its division of the marital estate; and 3) whether the Trial Court erred in awarding Wife $6,210 per month in alimony in futuro.

We first address Wife's issue of whether the Trial Court erred in holding that Husband's "book of business" constitutes future income rather than marital property. The classification of property during a divorce proceeding as either marital or separate property

is a question of fact to be determined by the trial court upon consideration of all relevant circumstances. *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245 (Tenn. 2009). We review questions of fact *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Kelly*, 445 S.W.3d at 692. A trial court has wide discretion when classifying and dividing the marital estate, and its findings are entitled to great weight on appeal. *Sullivan v. Sullivan*, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002). Therefore, unless a trial court's decision concerning the classification or division of property is contrary to the preponderance of the evidence or is based on an error in law, we will not interfere with the trial court's decision on appeal. *Id*.

The issues on appeal implicate the abuse of discretion standard of review. The Tennessee Supreme Court has expounded upon the abuse of discretion standard of review as follows:

> This Court has described the abuse of discretion standard in some detail:

>> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the court below, or to substitute their discretion for the lower court's. The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny.

>> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted); *see also BIF, a Div. of Gen. Signals Controls, Inc. v. Serv. Const. Co.*, No. 87-136-II, 1988 WL 72409, at *2 (Tenn. Ct. App. July 13, 1988) (citations omitted) ("The standard conveys two notions. First, it indicates that the trial court has the authority to choose among several legally permissible, sometimes even conflicting, answers. Second, it indicates that the appellate court will not interfere with the trial court's decision simply because it did not choose the alternative the appellate court would have chosen.").

*Lee Medical* provided the framework for determining whether a trial court has properly exercised its discretion:

> To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions.

*Lee Med.*, 312 S.W.3d at 524-25 (citing *Flautt & Mann v. Council of City of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF*, 1988 WL 72409, at *3)); s*ee also Vodafone Americas Holdings, Inc. & Subsidiaries v. Roberts*, 486 S.W.3d 496, 514 (Tenn. 2016).

*Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305-06 (Tenn. 2020). "A trial court abuses its discretion only when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining. The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court." *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 294 (Tenn. 2017) (internal quotation marks, brackets, and citations omitted). With respect to credibility determinations, the Tennessee Supreme Court has instructed:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d

215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ––– U.S. ––––, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly*, 445 S.W.3d at 692-93. In Tennessee, marital property is defined by statute as follows:

(1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce, except in the case of fraudulent conveyance in anticipation of filing, and including any property to which a right was acquired up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date. In the case of a complaint for legal separation, the court may make a final disposition of the marital property either at the time of entering an order of legal separation or at the time of entering a final divorce decree, if any. If the marital property is divided as part of the order of legal separation, any property acquired by a spouse thereafter is deemed separate property of that spouse. All marital property shall be valued as of a date as near as possible to the date of entry of the order finally dividing the marital property;

(B)(i) "Marital property" includes income from, and any increase in the value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation;

(ii) "Marital property" includes the value of vested and unvested pension benefits, vested and unvested stock option rights, retirement,

-17-

and other fringe benefit rights accrued as a result of employment during the marriage;

(iii) The account balance, accrued benefit, or other value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefits accrued as a result of employment prior to the marriage, together with the appreciation of the value, shall be "separate property." In determining appreciation for purposes of this subdivision (b)(1)(B)(iii), the court shall utilize any reasonable method of accounting to attribute postmarital appreciation to the value of the premarital benefits, even though contributions have been made to the account or accounts during the marriage, and even though the contributions have appreciated in value during the marriage; provided, however, the contributions made during the marriage, if made as a result of employment during the marriage and the appreciation attributable to these contributions, would be "marital property." When determining appreciation pursuant to this subdivision (b)(1)(B)(iii), the concepts of commingling and transmutation shall not apply;

(iv) Any withdrawals from assets described in subdivision (b)(1)(B)(iii) used to acquire separate assets of the employee spouse shall be deemed to have come from the separate portion of the account, up to the total of the separate portion. Any withdrawals from assets described in subdivision (b)(1)(B)(iii) used to acquire marital assets shall be deemed to have come from the marital portion of the account, up to the total of the marital portion;

(C) "Marital property" includes recovery in personal injury, workers' compensation, social security disability actions, and other similar actions for the following: wages lost during the marriage, reimbursement for medical bills incurred and paid with marital property, and property damage to marital property;

(D) As used in this subsection (b), "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine;

(E) Property shall be considered marital property as defined by this subsection (b) for the sole purpose of dividing assets upon divorce or legal

separation and for no other purpose; and assets distributed as marital property will not be considered as income for child support or alimony purposes, except to the extent the asset will create additional income after the division[.]

Tenn. Code Ann. § 36-4-121(b)(1) (West July 1, 2017 to March 30, 2022).

In her brief, Wife argues that "Husband's book of business gives rise to two valuable intangible assets: (1) the potential recruitment bonus he will monetize if he goes to a new firm; and (2) the unvested retirement benefit he will monetize if he retires under the UBS Alpha retirement program, or some other similar retirement program at another firm." Wife contends that, in the financial industry, the "Trailing Twelve" formula and a financial advisor's "book of business" hold specific value amenable to classification and distribution as marital property in a divorce. Wife relies in large measure upon the testimony of Robert Vance ("Vance"), a certified public accountant who testified as an expert for Wife. Vance testified, in part:

Q. And what was your -- what was your opinion in regard to whether or not the husband possesses intangible assets to which a right was acquired up to the date of the final divorce hearing?
A. Yes. Definitely there is an intangible asset value. It's the potential future recruitment bonus if one were to happen and the retirement from ALFA or from whomever it might be. But the intangible asset itself, the one that's the important one, is the -- it's the assets under management. It's the relationship with the clients, the assets under management, and the revenue that those assets produce. That's the key right there, is the relationship and the revenue.

***

Q. (By Ms. O'Dwyer) How is that different from, say, for instance, the AUM as being different from just a list of potential return clients?
A. It's not much different. The AUM is -- remember that's owned by the individual client. Okay? The AUM is not owned by anybody other than that client, that customer or whatever. That person owns their own assets.
    The broker owns the relationship, if you will, and will collect from the revenue generated by the assets under management. So a client with assets under management is sort of like a patient with teeth, a patient with teeth, and the teeth need to be fixed by the dentist. And so that's -- I mean, that's the correlation there.

-19-

Q. Well, Mr. Hollis doesn't have to do anything about those AUMs, does he, the assets? He doesn't have to go fix the assets on any regular basis. Don't they produce income without his actually getting into the patient's mouth?

A. Right. They produce revenue. I mean, he does the trading. I mean, he oversees them, and that's his job. They're assets under management, and he's managing them. So he is dealing with the assets themselves, but, yes, he's not -- he doesn't have the personal hands-on generation of the revenue like a dentist does.

Q. Can the assets under management be assigned and still continue to produce income?

A. Certainly, without beat.

Q. You can't assign your dental patients, can you? You can't sell them?

A. Well, no one can sell -- I mean, this whole concept of selling a patient or selling a client, you can't sell the individual, and you're not selling their assets. Okay? What you're selling -- what you're doing is you're assigning the right -- or you're assigning that income to another person, is essentially what you're doing, and you're being paid for that assignment.

Q. And is that assignment basically what you find to be the -- the right to assign being the intangible asset?

A. Correct. It's the revenue. The revenue itself is the asset. I mean, it's sort of all wrapped up together in this one intangible ball, if you will. It's the relationship, and that relationship then allows for that revenue to come to you.

Q. Can you explain to the Court how this industry -- what is unique -- let me ask it this way: What is unique about financial advisors' ability to monetize their AUM and their TTM, the trailing twelve, that is not consistent with other industries?

A. Well, in other industries you're retiring, and you're getting out of that business. I go back to my example, but it's a classic example. A professional sells their CPA practice and gets into another line of work. I didn't retire, but I got into a different line of work. Usually like when a dentist or someone like that sells, they're retiring.

In this case, what's very unique is that on the high-end producers like Mr. Hollis is highly sought after. His assets under management are highly sought after because the revenue it produces, $1.4 million. That's a lot of money. So he's paid a recruitment bonus to lure him over to another practice, and that's what Raymond James -- that's what they were negotiating there with Raymond James, was that recruitment bonus.

For his part, Husband argues in his brief that the very term "book of business" is a misnomer. Instead, Husband asserts that his book of business really is just his personal

goodwill. Husband says further that if he retires and enters the ALFA program, he "is paid only to the extent that he assists in successfully transitioning his clients to a new financial advisor." Husband states:

> If Husband changes employment *and agrees to provide 8-10 more years of service to his new employer*, he could perhaps negotiate a deal which attaches value to his "book of business"—although his attempt to negotiate such a deal with Raymond James was not successful, and it has become harder to negotiate such a deal since then. But any owner of individual goodwill can do that. An attorney can convert a favorable reputation into money by agreeing to change firms. A physician can convert a favorable reputation into money by agreeing to change practices. The individual goodwill of attorneys and physicians is still not marital property, because the goodwill can be monetized only in the form of increased future earnings, and future earnings are not presently existing marital property.

(Emphasis in original).

Husband's managing advisor at UBS, Ronald Johnson, testified as to what happens when a financial advisor leaves or retires from UBS:

> Q. Okay. And I know there's a program in place. But just specifically in the scope of your employment, what do you do with relationships when someone retires?
> A. Well, it depends on the individual that retires. If someone retires and they haven't become part of our transition program, then those relationships get reassigned to other financial advisors just as though in any other case where a financial advisor leaves for whatever reason.
> If they've entered into our transition program, then they have already identified who it is they would like their clients to go to. That's predetermined so that at that transition date, when they leave as it relates to active service with us, then those clients are then with the team or the individual that the retiring FA has actually asked that they be with, and then the retiring FA is actually paid for a number of years forward as part of the revenue that those relationships generate for UBS.
> Q. Do you know the name of the retirement -- the transition program that you're referring to?
> A. It's called ALFA.
> Q. And that's the syn -- not the synonym but the abbreviated -- it's got a longer name than that; correct?

A. Yeah. It's the -- I'm trying to think what it stands for. It's Legacy Financial Advisor Program.

Q. And just to clarify a point, you said if a financial advisor retires and doesn't elect to be a part of that program, can you give an example of what that would look like?

A. There's two circumstances. If you've got a partner already, then we respect that partnership and team, and those clients would go to the remaining member of the team in the practice. If not, if it's an individual standalone practice, then we simply reassign those relationships to other advisors inside that business.

Q. Can you give me an example of what it would look like to retire from UBS but not participate in that retirement program?

A. Yes. You just -- you leave, and your retirement plan is whatever you've got in your 401(k) or whenever. There's no additional income that can be paid from the business that you're now no longer registered with.

Q. Do you have to do anything -- does an employee, to participate in that program, have to do anything ongoing?

A. If they choose the ALFA program?

Q. Yes.

A. Yes. They have to maintain their continuing education, licenses and that because it can't be paid without the licenses. And in the early stage, they make the introduction from those relationships to the practice, the partner, the individual that you're going to be transitioning that business to.

Q. At what level is that program contingent on retention of those clients, relationships?

A. One hundred percent.

Both Husband and Wife contend with *Fuller v. Fuller*, No. E2016-00243-COA-R3-CV, 2016 WL 7403791 (Tenn. Ct. App. Dec. 21, 2016), *no appl. perm. appeal filed*, a case addressing issues similar to those before us in the appeal at bar. In *Fuller*, another divorce case, the trial court found that "Father's trail income generated by his ongoing management of his clients' accounts [at his own financial planning practice] was also a divisible marital asset separate and apart from any goodwill of the business." *Id*. at *2. On appeal, we affirmed this finding. *Id*. at *6. We set out the issue thusly:

> Father asserts that the trial court erred in classifying his sole proprietorship, Legacy Investments, as a marital asset subject to equitable division. According to Father, the business owns no real estate, furniture, or any tangible assets of value. Furthermore, Father asserts that the business depends solely on his efforts to generate income. Father thereby argues that the business has no value aside from goodwill, noting that this Court has

repeatedly held that professional goodwill in a sole proprietorship is an intangible asset that is not divisible as marital property upon divorce because it is personal to the proprietor. *See, e.g., Hartline v. Hartline*, No. E2012-02593-COA-R3-CV, 2014 WL 103801, at *13 (Tenn. Ct. App. Jan. 13, 2014); *Eberting v. Eberting*, No. E2010-02471-COA-R3-CV, 2012 WL 605512, at *19 (Tenn. Ct. App. Feb. 27, 2012). Mother contends that the trial court properly valued the trail income from the business as a marital asset, upon determining that the trail income constituted an asset separate from goodwill.

*Fuller*, 2016 WL 7403791, at *4. We noted that "[g]oodwill in the context of business valuation has been defined as a reasonable expectation of a business's continued profitable operation" and that, when valuing goodwill, "[m]any factors are involved; the name of the firm, its reputation for doing business, the location, the number and character of its customers, the former success of the business, and many other elements which would be advantageous in the operation of the business." *Id*. at *5 (internal quotation marks, citations, and brackets omitted). We observed that it is "well settled under Tennessee law that professional goodwill is not a marital asset that can be divided in a divorce proceeding[,]" with the rationale being that "in the cases disallowing goodwill as a component of the estate in valuing a professional practice results from the inequity in compelling a professional practitioner to pay a spouse a share of an intangible asset at a judicially determined value that could not be realized by a sale or another method of liquidating value." *Id*. (citations omitted). We stated further:

> The concept of professional good will evanesces when one attempts to distinguish it from future earning capacity. Although a professional business's good reputation, which is essentially what its good will consists of, is certainly a thing of value, we do not believe that it bestows on those who have an ownership interest in the business, an actual, separate property interest. The reputation of a law firm or some other professional business is valuable to its individual owners to the extent that it assures continued substantial earnings in the future. It cannot be separately sold or pledged by the individual owners.

*Fuller*, 2016 WL 7403791, at *5-6 (emphasis in original) (quoting *Smith v. Smith*, 709 S.W.2d 588, 591-92 (Tenn. Ct. App. 1985)). We concluded:

> By contrast, the trail income under review in the present case could be sold or assigned by Father, as he acknowledged. According to Father, a recognized methodology exists for valuing a financial planning practice if it were to be sold, which is one times the annual value of income due to direct

commissions plus two times the annual value of trail income. Father testified that his clients were not mandated to keep their accounts with whomever might purchase his practice, however. Such a sale would therefore usually require that the sale price be paid out over a period of time in order to insure client retention.

Father also explained that in the event of his death or disability, he could assign his trail income to another financial planner in order to maintain an income stream for himself or his family. According to Father, this type of transaction would normally require an agreement with the assignee that Father or his family would be paid a percentage of the ongoing trail income. Mr. Jones confirmed Father's testimony regarding the valuation methodology for the sale of a financial planning practice, stating that the "guideline is two times a year's trail, plus ... one times the [direct] commission."

Inasmuch as the undisputed evidence demonstrated that Father's trail income could be sold or assigned and that there exists a recognized methodology within the industry for valuing such trail income as sellable property, we conclude that the trial court properly determined Father's trail income to be a divisible marital asset. In contrast to professional goodwill, Father's trail income could be sold separately. *See Smith*, 709 S.W.2d at 591-92. We therefore determine this to be a controlling factor, distinguishing its nature as an asset from the concept of goodwill. Furthermore, the fact that Father could assign his trail income for value upon his disability or death also supports the conclusion that such income constitutes a divisible marital asset. *See, e.g., Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995) (holding that income payable to the husband, an insurance agent, upon his death, based on the value of his customers' insurance policies "on the books" of his agency, was a marital asset subject to division). We therefore affirm the trial court's determination in this regard.

*Fuller*, 2016 WL 7403791, at *6.

*Fuller* is instructive but distinct. The financial advisor in the <u>*Fuller*</u> case sold products. Mr. Hollis's 'book of business' requires him to keep clients, work their investments to produce income, and remain employed." In *Fuller*, we concluded that the trial court properly determined that the father's trail income was a divisible marital asset "[i]nasmuch as the undisputed evidence demonstrated that Father's trail income could be sold or assigned and that there exists a recognized methodology within the industry for valuing such trail income as sellable property...." 2016 WL 7403791, at *6. There is no

-24-

such undisputed evidence in the present case. On the contrary, the parties sharply contested at trial and now on appeal the sellable nature of Husband's so-called book of business. Husband made no admissions that either his book of business or trail income can be sold without regard to any future services on his part. Another distinction from *Fuller* is that the father in that case was a solo practitioner.

Nevertheless, Wife cites *In re Marriage of Finby* (2013), 222 Cal. App. 4th 977, and *Wojanowski v. Wojanowski*, No. 99751, 2014-Ohio-697, 2014 WL 811785, for the proposition that when a financial advisor acquires a book of business during his or her marriage that is marketable, assignable, and has value in the financial industry, it is proper to treat the book of business as marital property subject to equitable division. These cases, however, are not controlling law in Tennessee. Tennessee's jurisprudence on goodwill differs from that of California and Ohio.

In another line of argument, Wife cites *Cohen v. Cohen*, 937 S.W.2d 823 (Tenn. 1996) for the proposition—now codified by statute—that marital property includes unvested retirement benefits, and that Husband's book of business is analogous to such unvested benefits. Wife is correct in her statement of the law as to unvested retirement benefits qualifying as marital property. However, Husband's so-called book of business is not akin to unvested retirement benefits. Rather, it is akin to future income. Husband has to continue working in order to be paid; the pension analogy does not work here.

Wife also relies on Vance's expert testimony. Vance valued Husband's intangible marital property interests at $1,770,000.00 for his potential recruitment bonuses and $1,960,000.00 for Husband's retirement interest. Vance based his opinion on the marketability of the book of business stemming from the Trailing Twelve. In addition, Vance articulated the deferred distribution method whereby Wife would receive half of her marital portion if and when Husband collects on his two intangible assets arising from his book of business based on a coverture fraction. Wife points out that Husband did not put on any expert of his own to oppose Vance.

While Wife is correct in that Husband did not put on his own expert, this Court has stated that "the trier of fact [(here, the Trial Court)] is not bound to accept an expert witness's testimony as true, and it may reject any expert testimony that it finds to be inconsistent with the credited evidence or is otherwise unreasonable." *Roach v. Dixie Gas Co.*, 371 S.W.3d 127, 150 (Tenn. Ct. App. 2011) (citing *Dickey v. McCord*, 63 S.W.3d 714, 720-21 (Tenn. Ct. App. 2001)). It was the Trial Court's prerogative to reject Vance's testimony. In addition, while Husband did not put on his own expert to counter Vance, the record is replete with evidence from which the Trial Court could, as it did, draw a conclusion contrary to Vance's. The Trial Court had a factual basis upon which to base its determination as to the classification of Husband's book of business.

-25-

We emphasize that the classification and division of marital property implicates a trial court's discretion. *Sullivan v. Sullivan*, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002). The Trial Court heard extensive testimony at trial. The Trial Court then considered and rationally distinguished *Fuller*, a recent case from this Court addressing trail income in the financial industry for purposes of divorce litigation. In so doing, we find that the Trial Court did not apply an incorrect legal standard; did not reach an illogical or unreasonable decision; and did not base its decision on a clearly erroneous assessment of the evidence. We find instead that the Trial Court's decision has a factual basis properly supported by evidence in the record; that the Trial Court identified and applied the most appropriate legal principles applicable to the decision; and that the Trial Court's decision is within the range of acceptable alternatives. In sum, the Trial Court did not abuse its discretion. We affirm the Trial Court in its determination that Husband's book of business is not a marital asset subject to equitable division.

We next address Husband's issues, beginning with whether the Trial Court erred in ordering an upward deviation in child support to $8,516 per month.[1] Child support obligations are governed by the Child Support Guidelines, which are promulgated by the Tennessee Department of Human Services in accordance with Tenn. Code Ann. § 36-5-101(e). A trial court may, in its discretion, deviate from the support required by the Child Support Guidelines. *State v. Wilson*, 132 S.W.3d 340, 343 (Tenn. 2004). Tenn. Code Ann. § 36-5-101(e)(1)(B) provides that "if the net income of the obligor exceeds ten thousand dollars ($10,000.00) per month, then the custodial parent must prove, by a preponderance of the evidence, that child support in excess of the amount provided for in the child support guidelines is reasonably necessary to provide for the needs of the minor child or children of the parties." Tenn. Code Ann. § 36-5-101(e)(1)(B) (West July 1, 2017 to June 30, 2018).

On this issue, Husband makes two primary arguments. First, Husband argues that the Trial Court miscalculated his monthly income for child support purposes to be $73,530.48, or Husband's average gross monthly income for the years 2015-2017. Husband specifically contends that the Trial Court erred by including his forgivable loan in its calculation of his income, as "the record reflects that Husband received only one forgivable loan in his 30+-year career, when he joined UBS in 2008; the loan was forgiven over nine years." In his reply brief, Husband states that the Trial Court "proceeded to calculate his income as though the loan would continue in perpetuity." Second, Husband argues that the Trial Court failed to apply the appropriate standard—that of reasonable necessity—for a child support case such as this one where the net income of the obligor

---

[1] In her reply brief, Wife argues that Husband waived his issues concerning child support, alimony, and certain aspects of the division of the marital estate by failing to be specific enough about them in his statement of the issues. We find that Husband adequately raised these issues and we proceed to consider them.

exceeds $10,000 per month. Husband points to the Trial Court's statement that it was going to render an award of child support that was "generous, but not unlimited," and also the Trial Court's remarks that it might be making "new law" with its deviation.

With respect to the calculation of Husband's income for child support purposes, we discern no reversible error in the Trial Court's consideration of Husband's forgivable loan as a part of Husband's income. The fact that Husband earned his income in part by means of a forgivable loan did not make it any less a part of his income. It was proper for the Trial Court to consider what Husband actually earned in its calculation of his income for child support purposes. Regarding the Trial Court's remarks cited by Husband as evidence of an abuse of discretion, we find these remarks harmless. The Trial Court stated that it would fashion a "generous, but not unlimited" award of child support before adding that "[t]he Court will set a budget for the children in an amount the Court finds to be reasonable, after reviewing all of the exhibits in this case concerning money spent versus money actually needed." (Emphasis added). Thus, the Trial Court ultimately applied the correct standard. While the Trial Court remarked that it may be making new law, it in fact did not make new law. Finally, an award of child support may be both fully consistent with the Child Support Guidelines and accurately described as "generous." Here, the evidence at trial was overwhelming as to the minor children's severe disability. There simply is no doubt as to their extensive need. This extensive need, regrettably, will endure for the rest of their lives. The evidence does not preponderate against the Trial Court's factual findings relative to this issue.

In arriving at its award of child support, the Trial Court did not apply an incorrect legal standard; did not reach an illogical or unjust decision; and did not base its decision on a clearly erroneous assessment of the evidence. We find instead that the Trial Court's decision has a factual basis properly supported by evidence in the record; that the Trial Court properly identified and applied the most appropriate legal principles applicable to the decision; and that the Trial Court's decision was within the range of acceptable alternative dispositions. We discern no abuse of discretion in the Trial Court's award of child support.

We next address whether the Trial Court erred in its division of the marital estate. We begin by reviewing the applicable standard. In *Keyt v. Keyt*, 244 S.W.3d 321 (Tenn. 2007), the Tennessee Supreme Court articulated the appellate standard of review for a trial court's division of a marital estate as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and

procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt*, 244 S.W.3d at 327.

In *Larsen-Ball v. Ball*, 301 S.W.3d 228 (Tenn. 2010), the Tennessee Supreme Court effectively reasserted the deferential standard of review articulated in *Keyt*, stating:

After classifying the divorcing parties' assets as either separate or marital, the trial court must divide the marital estate equitably by weighing the relevant factors enumerated in Tennessee Code Annotated section 36-4-121(c). We give great weight to the trial court's division of marital property and " 'are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.' " *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)).

Tennessee Code Annotated section 36-4-121(c) provides that in making an equitable division of marital property, the trial court shall consider all relevant factors. Because trial courts have broad discretion in dividing the marital estate, the division of marital property is not a mechanical process. *Flannary* [*v. Flannary*]*,* 121 S.W.3d [647] at 650 [(Tenn. 2003)]. Rather, the trial court should weigh the most relevant factors in light of the facts of each case. *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003). We review the trial court's findings of fact de novo with a presumption of correctness and honor those findings unless the evidence preponderates to

the contrary. Tenn. R. App. P. 13(d); *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008). When issues of credibility and weight of testimony are involved, we afford considerable deference to the trial court's findings of fact. *Keyt*, 244 S.W.3d at 327.

*Larsen-Ball*, 301 S.W.3d at 234-35 (footnote omitted).

When dividing a marital estate, Tennessee courts are to consider the following statutory factors toward rendering an equitable division:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;

(11) The amount of social security benefits available to each spouse; and

(12) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (West July 1, 2017 to March 30, 2022).

Husband acknowledges that this Court extends deference to a trial court's division of a marital estate, but asserts that the Trial Court's distribution lacks evidentiary support. Husband's issue with the Trial Court's division of the marital estate stems in large part from the Trial Court's treatment of certain structured notes. In his reply brief, Husband states:

> The trial court stated that once distributed, the proceeds from the structured notes in account #751 were the parties' separate property. Husband placed his half of the proceeds in account #090. Account #090 contained no funds other than Husband's separate property. The trial court erred in including account #090 in the final MAL and in failing to include Wife's half of the structured note proceeds from account #751.

According to Husband, the Trial Court erred by including accounts #751 and #090 in the final Master Asset List and made a "mathematical error" in modifying Husband's portion of the proceeds of the sale of the Franklin home. Husband also contends that the Trial Court erred in awarding Wife a Health Savings Account (HSA) and in "arbitrarily add[ing] a value of $5,000 in personal property to Husband."

-30-

The parties disagree as to the ratio resulting from the Trial Court's division of the marital estate. Husband states that the final division of the marital estate is approximately 60/40 in Wife's favor when considering the Trial Court's "math errors." For her part, Wife contends that the split is actually 50.6% to her and 49.4% to Husband, and that the marital estate as valued by the Trial Court is worth around $2,750,000. Wife asserts that the Trial Court gave Husband a "far larger" portion of the structured notes; that an alleged $5,000 valuation error is de minimis out of a marital estate of this size; and that Husband has failed to show how the Trial Court's overall distribution of the marital estate was inequitable.

Throughout his principal appellate brief and reply brief, Husband states repeatedly that the Trial Court made mathematical errors in dividing the marital estate. Husband cites to *Ramsey v. Ramsey*, No. E2012-01940-COA-R3-CV, 2013 WL 5827648 (Tenn. Ct. App. Oct. 29, 2013), *no appl. perm. appeal filed*, for the proposition that this Court may modify a trial court's judgment concerning its division of a marital estate in order to correct for mathematical errors. In *Ramsey*, "[t]he [trial] court divided the aggregate marital estate equally, finding that each party was entitled to $58,476. The court stated, however, that because Wife had already received the entire amount of the settlement proceeds of $8,341, such amount would be deducted from her share of $58,476." *Id*. at *6. We modified the trial court's judgment to credit one-half of this particular asset back to Wife. *Id*. In so doing, this Court said: "We determine that the trial court committed a mathematical error in subtracting the full settlement amount when the court's intent was clearly to divide the assets equally between the parties." *Id*.

Husband is correct in that this Court has the authority to modify a trial court's division of a marital estate to correct clear mathematical errors. However, we will not disturb a trial court's division of a marital estate where the alleged math error is really just an unfavorable result. In the end, "what we are concerned with as to property division is the overall division of the entire marital estate and whether that overall division is equitable." *Abner v. Abner*, No. E2019-01177-COA-R3-CV, 2020 WL 5587411, at *4 (Tenn. Ct. App. Sept. 18, 2020), *R. 11 perm. app. denied Jan. 13, 2021*. Husband fails to explain why a 60/40 division in Wife's favor of the overall marital estate—granting *arguendo* that is the effective result of the Trial Court's orders—is inequitable as opposed to a 50/50 division or any other ratio for that matter. While Husband states that the Trial Court's orders did not match its expressed intent, we find no evidence that is the case; the Trial Court spoke through its orders. The Trial Court made findings in accordance with the factors found at Tenn. Code Ann. § 36-4-121, stating in part that "[l]ooking at her obligations, her needs, and the financial resources of each party, Ms. Hollis will be receiving a larger portion of the marital estate in an effort to provide for herself and the two children." The Trial Court went on to dispose of the specific marital assets including the structured notes as best it could, resulting in Wife "receiving a larger portion of the marital estate…." The evidence does not preponderate against the Trial Court's factual

-31-

findings relative to the division of the marital estate. There being no argument from Husband that the Trial Court's final, overall division of the entire marital estate was inequitable, we decline Husband's request to modify the Trial Court's division of the marital estate as to any particular asset, alleged math errors notwithstanding.

We find that the Trial Court, in its division of the marital estate, did not apply an incorrect legal standard; did not reach an illogical or unjust decision; and did not base its decision on a clearly erroneous assessment of the evidence. We find instead that the Trial Court's decision has a factual basis properly supported by evidence in the record; that the Trial Court properly identified and applied the most appropriate legal principles applicable to the decision; and that the Trial Court's decision was within the range of acceptable alternative dispositions. We discern no abuse of discretion in the Trial Court's division of the marital estate.

The last issue of Husband's we address is whether the Trial Court erred in awarding Wife $6,210 per month in alimony in futuro. We begin by reviewing the applicable standard. Our Supreme Court has stated:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. *See Robinson v. Robinson*, 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce ... the wife is entitled to a fair portion of her husband's estate for her support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor...."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).
>
> ***
>
> The first type of spousal support, alimony in futuro, is intended to provide support on a long-term basis until the death or remarriage of the recipient. Tenn. Code Ann. § 36-5-121(f)(1). This type of alimony can be awarded where "the court finds that there is relative economic disadvantage and that rehabilitation is not feasible." *Id. See also Burlew*, 40 S.W.3d at 470-71; *Riggs v. Riggs*, 250 S.W.3d 453, 456 n. 2 (Tenn. Ct. App. 2007). Alimony in futuro is appropriate when

the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse.

Tenn. Code Ann. § 36-5-121(f)(1).

Alimony in futuro "is not, however, a guarantee that the recipient spouse will forever be able to enjoy a lifestyle equal to that of the obligor spouse." *Riggs*, 250 S.W.3d at 456 n. 2. In many instances, the parties' assets and incomes simply will not permit them to achieve the same standard of living after the divorce as they enjoyed during the marriage. *Robertson* [*v. Robertson*], 76 S.W.3d [337] at 340 [(Tenn. 2002)]. While enabling the spouse with less income "to maintain the pre-divorce lifestyle is a laudable goal," the reality is that "[t]wo persons living separately incur more expenses than two persons living together." *Kinard* [*v. Kinard*], 986 S.W.2d [220] at 234 [(Tenn. Ct. App. 1998)]. "Thus, in most divorce cases it is unlikely that both parties will be able to maintain their pre-divorce lifestyle...." *Id.* It is not surprising, therefore, that "[t]he prior concept of alimony as lifelong support enabling the disadvantaged spouse to maintain the standard of living established during the marriage has been superseded by the legislature's establishment of a preference for rehabilitative alimony." *Robertson*, 76 S.W.3d at 340.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105, 107-08 (Tenn. 2011).

In addition, courts are to consider the following statutory factors when deciding whether to award alimony and, if so, in what form:

(i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i) (West April 25, 2011 to March 30, 2022).

Husband makes several arguments with respect to this issue, to wit: that the Trial Court did not place sufficient weight on the amount of assets awarded to Wife pursuant to Tenn. Code Ann. § 36-4-121; that the Trial Court failed to take Wife's adultery into account in its award of alimony; that the Trial Court duplicated expenses in its alimony award; that

the Trial Court erred in its calculation of Husband's income by including "phantom income" from his forgivable loan; and the Trial Court failed to take into account that Wife once worked as a broker and could be rehabilitated or transitioned as opposed to requiring an award of alimony in futuro. Citing what he contends is an example of the Trial Court's excessive award to Wife, Husband states: "After apparently crediting Wife's statements that she needs two days per week of respite from the children, the court awarded her more respite time than she described as her need." In response, Wife states that the Trial Court made findings of fact corresponding to the statutory factors for an award of alimony and that Husband has failed to show that these findings are unreasonable.

The Trial Court made factual findings corresponding to the applicable statutory factors.[2] We disagree with Husband that the Trial Court failed to take Wife's fault into account when rendering its award of alimony. The Trial Court simply found, by implication, that other factors were more compelling under these circumstances. The parties' relative fault is, after all, but one of the statutory factors for consideration. It is further evident that the Trial Court considered the effect of its having granted Wife a larger portion of the marital estate. The Trial Court cited, among other things, Wife's economic disadvantage relative to Husband, as well as her providing care for the parties' severely disabled children. With respect to the Trial Court's calculation of income, Husband repeats an argument he makes elsewhere—namely, that counting his forgiven loan as part of his income is erroneous because it is "phantom income." Whether this portion of Husband's income is couched as "phantom" or not, it is income nonetheless. With respect to the prospect of Wife retraining or re-entering the workforce and earning enough money so as to be independent of Husband, the Trial Court found: "There is little proof on her ability to retrain for her former job at this time."; "[I]t is reasonable for Ms. Hollis to remain at home and take care of these children."; and "[t]here has not been a showing that she has the ability to secure the necessary education and training to improve her earning capacity at this time." Thus, while Wife has the potential capacity to earn a good income, she cares for the parties' severely disabled minor children and has not had the occasion to further her education or training so as to make transitional or rehabilitative alimony sufficient or appropriate. The evidence does not preponderate against the Trial Court's factual findings on this issue, especially insofar as they relate to Wife's need and Husband's ability to pay. Husband also takes issue with Wife's credibility. However, the Trial Court found both parties' credibility wanting at different times. We extend considerable deference to a trial

---

[2] In its February 2020 order, the Trial Court appears to have cited the wrong statutory factors for an award of alimony, citing the factors found at Tenn. Code Ann. § 36-4-121 for the equitable division of a marital estate rather than the alimony factors found at Tenn. Code Ann. § 36-5-121. Nevertheless, the Trial Court's findings reflect that it considered the factors applicable to an award of alimony, such as its consideration of the parties' relative fault—a factor considered for alimony purposes but not in the equitable division of the marital estate.

court's credibility determinations. We find no clear and convincing evidence in this record that would serve to overturn the Trial Court's credibility determinations as to either party.

In granting an award of alimony to Wife in the type and amount that it did, the Trial Court did not apply an incorrect legal standard; did not reach an illogical or unreasonable decision; and did not base its decision on a clearly erroneous assessment of the evidence. We find instead that the Trial Court's decision has a factual basis properly supported by evidence in the record; that the Trial Court applied the most appropriate legal principles applicable to the decision; and that the Trial Court's decision was within the range of acceptable alternative dispositions. We discern no abuse of discretion in the Trial Court's award of alimony in futuro to Wife.[3]

The final issue we address is Wife's issue of whether she should be awarded her attorney's fees incurred on appeal. Wife argues that she should be awarded her attorney's fees incurred on appeal because of the cost-shifting statute, Tenn. Code Ann. § 36-5-103, as well as the fact that she is an economically disadvantaged spouse. Husband offers no separate argument in his briefs in opposition to this issue apart from his arguments concerning the underlying alimony/child support matters. "In determining whether an award of attorney's fees is warranted, this Court should consider, among other factors, the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered." *Baxter v. Rowan*, 620 S.W.3d 889, 897-98 (Tenn. Ct. App. 2020) (internal quotation marks and citations omitted). According to statute:

> (c) The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Tenn. Code Ann. § 36-5-103(c) (West July 10, 2017 to June 30, 2018).[4]

---

[3] In passing at the end of both his principal appellate brief and his reply brief, Husband states that this Court should award him his attorney's fees incurred on appeal. He did not identify this as an issue in his statement of the issues; the attempted issue is therefore waived. We decline to award Husband his attorney's fees incurred on appeal.

[4] Tenn. Code Ann. § 36-5-103(c) was amended effective July 1, 2018, with the amendment applying "to

Wife has successfully defended her awards of child support and alimony on appeal. In consideration of all relevant factors and the equities, and in the exercise of our discretion, we grant Wife her attorney's fees incurred on appeal as they relate to issues of child support and alimony. On remand, the Trial Court is to determine and enter an award to Wife of her reasonable attorney's fees incurred on appeal, but only those attorney's fees related to Wife's defense of her awards of child support and alimony. We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion. The costs on appeal are assessed one-half against the Appellant, Melanie Miller Hollis, and her surety, if any, and one-half against the Appellee, Charles Myers Hollis, Jr.


_____
D. MICHAEL SWINEY, CHIEF JUDGE

actions commenced on or after that date." 2018 Tenn. Laws Pub. c. 905. Wife cites the statute as amended in her reply brief. Wife filed her complaint, which commenced this action, on April 2, 2018. Thus, the 2018 amendment does not apply. The amendment is not outcome-determinative in this appeal, however.